Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio


## OPINION

No. 04-10-00385-CV

**GUARDIANSHIP OF C.E.M.-K., A Minor**,

From the Probate Court No. 1, Bexar County, Texas
Trial Court No. 2009-PC-1911
Honorable Polly Jackson Spencer, Judge Presiding

Opinion by:    Marialyn Barnard, Justice

Sitting:    Rebecca Simmons, Justice
    Steven C. Hilbig, Justice, concurring in the judgment only
    Marialyn Barnard, Justice

Delivered and Filed:  February 16, 2011

AFFIRMED

This is an appeal from a judgment in a suit affecting the parent-child relationship.  After the death of C.E.M.-K.'s mother, M.M., a dispute regarding custody arose between the child's former stepfather and her biological father.  Following a bench trial, the trial court appointed the child's former stepfather, appellee B.H.M., sole managing conservatorship of the minor child, and the child's biological father, J.P.K., possessory conservator.  J.P.K. appeals, contending: (1) B.H.M. had no standing, and therefore the trial court's judgment is void; and (2) the trial court abused its discretion in appointing B.H.M., rather than J.P.K., as the child's managing conservator.  We affirm the trial court's judgment.

**BACKGROUND**

The extensive facts begin when J.P.K. and M.M. were married in 1995. On January 27, 1999, M.M. gave birth to a female child, C.E.M.-K., who was conceived through artificial insemination. After the child's birth, the couple ceased cohabiting, and M.M. filed for divorce in October 2000. The couple was divorced by a final decree signed by a Hays County, Texas trial court on July 12, 2002. Pursuant to the divorce decree, M.M. was named sole managing conservator of C.E.M.-K. J.P.K. was named possessory conservator, and the parties agreed he was to have possession "at all times agreed to by the parties." The parties also agreed J.P.K. would be given reasonable telephone access to C.E.M.-K., and that he would notify M.M. "a reasonable period in advance of when he is requesting possession of the minor child." It seems this arrangement worked for a time, and J.P.K., who is an artist, kept C.E.M.-K. during the day when M.M. was at work. However, according to J.P.K., relations with M.M. became strained sometime in 2003 when he learned M.M. was having an affair with the principal of the school where she worked. M.M. moved away from the family residence in Wimberley to San Antonio, taking C.E.M.-K. with her. J.P.K. claimed he learned there were child abuse issues in the principal's family, and he contacted an attorney. This, according to J.P.K., was when "World War III" began with M.M.–she felt threatened. It appears that from that point forward, M.M. simply denied J.P.K. access to C.E.M.-K.

Around this same time, J.P.K. began to suffer debilitating medical problems stemming from injuries suffered in 1969 during his military service in Vietnam. In early 2004, he underwent a kidney transplant, and ultimately had open-heart surgery to repair a heart valve. In the summer of 2004, and on the mend from his kidney transplant, J.P.K. began writing letters to M.M. asking to "re-establish" his relationship with C.E.M.-K., stating it had been a long time

since he had seen the child. In a subsequent letter, J.P.K. states he had not seen the child since December 2003. Six letters from J.P.K. to M.M. were admitted into evidence. The letters are from June 2004 to February 2005. In each letter J.P.K. asked to make arrangements to see C.E.M.-K, and asked to allow C.E.M.-K. to call him as well. In the last letter, J.P.K. referenced a phone message left for him by M.M. in which she allegedly stated she refused to allow J.P.K. to see C.E.M.-K. because neither he nor his mother are of any relation to C.E.M.-K. In response, he reminded her to read the divorce decree and the child's birth certificate.

J.P.K. admitted he stopped paying court-ordered child support in 2004. He stated that given M.M.'s refusal to allow him to see C.E.M.-K., it was his only option because he could not afford an attorney to go back to court to help him enforce his visitation rights. J.P.K. moved to Florida in late 2004. It appears from the record that after the February 2005 letter, there was no contact between J.P.K. and M.M. or J.P.K. and C.E.M.-K. J.P.K. testified, however, that he continued to seek help with the visitation issue, writing law enforcement, courts, attorneys, and others. However, given his lack of finances–his only income was military disability and money from a few art sales–no one would help him.

M.M. met B.H.M. in October 2003 when M.M. hired B.H.M.'s company to put up a fence at her new home in San Antonio. They began dating in January 2004, and B.H.M. and two of his three sons moved into M.M.'s home in November 2004. M.M. became pregnant, and the couple married in June 2005. Their daughter was born September 20, 2005. M.M.'s house had three bedrooms–the couple stayed in one room, B.H.M.'s boys in another, and C.E.M.-K. and the couple's new child stayed in the third bedroom.

Unfortunately, all was not well in the home. M.M. had a serious alcohol addiction, which eventually tore the family apart. B.H.M. testified that when he first met M.M., she drank without

a problem. Later, she was unable to control her drinking. B.H.M. admitted that when M.M. drank she could be violent, and at times was unable to take care of the children or even get out of bed. In 2006, he came home one evening and found M.M. drunk and angry. After dinner, he heard his youngest son screaming and found M.M. beating him. He admitted grabbing M.M. by the neck, dragging her out of the room, and slapping her. He then left the house with the boys, and a neighbor came over and took C.E.M.-K. and her half-sister to her house. M.M. called the police and filed a report. B.H.M. testified he was arrested a year later, but was placed on deferred adjudication, which he successfully completed. B.H.M. returned with his sons, and the couple resumed their relationship.

B.H.M. stated that M.M. was eventually able to stop drinking on her own. However, when her brother died, she began drinking again, and her drinking was exacerbated by prescription drug use. B.H.M. admitted buying alcohol for M.M., but stated he either had to provide it for her or she would drive under the influence and buy it herself, which might result in her death or arrest or the injury or death of some other motorist. In the spring of 2008, B.H.M. stated M.M. was "in a bad way," and someone called Texas Department of Family and Protective Services ("the Department"). M.M. was required to seek treatment for her alcoholism. While she was in a rehabilitation facility, all four children stayed with B.H.M. After M.M. completed rehabilitation, the Department closed the case. According to B.H.M., M.M. stayed sober for approximately two months, but then began to drink again. In June 2008, B.H.M. and M.M. separated; B.H.M. took his sons and left. M.M. filed for divorce, which was finalized on September 15, 2008. Pursuant to the divorce decree, B.H.M. and M.M. were named joint managing conservators of their child, but M.M. was given primary possession. After the divorce, C.E.M.-K. and her half-sister lived with M.M., but B.H.M. and his boys lived close by.

B.H.M. testified that after the divorce, he saw C.E.M.-K. and his daughter "constantly." He stated that he fed the children, made sure they got to school, and did all he could to support M.M. in her sobriety. B.H.M. said that although they were divorced, the family remained cohesive, generally staying together either at M.M.'s or at his home. He testified it was necessary for him to stay close by because of M.M.'s drinking cycles–if he was not there, he would have feared for the girls' safety.

In December 2008, the Department received a report of abuse and neglect in the M.M. household. An investigator for the Department, Jerusha Lee Jennings, went to the home to investigate. Jennings testified it was not safe to leave the girls with M.M., and she, along with M.M., agreed to a safety plan, which required the girls to live with B.H.M. M.M. did not mention J.P.K., telling Jennings C.E.M.-K. was conceived through artificial insemination. B.H.M. also failed to mention J.P.K., though he knew of him, claiming he was never asked about C.E.M.-K.'s father. Jennings stated she determined B.H.M.'s home was safe and C.E.M.-K. was comfortable staying with B.H.M. Accordingly, the girls moved into B.H.M.'s home on December 9, 2008. According to the evidence, the girls remained with B.H.M. until the Department closed the case and returned the girls to M.M. in early April 2009, after M.M. had completed the Department requirements. Until the girls returned to M.M.'s home, B.H.M. stated he was fully responsible for their care and well-being.

As a result of the investigation, the Department found "reason to believe" both M.M. and B.H.M. had engaged in negligent supervision and physical neglect of both C.E.M.-K. and her half-sister. "Reason to believe" is defined by the Department to mean "a preponderance of the evidence supports that the alleged abuse or neglect did occur." However, Jennings testified the findings as to B.H.M. were technical, based on the fact that given the first abuse report in the

spring of 2008, he had been required to report to the Department if M.M. began to drink again. His failure to report M.M.'s drinking was cause for the "reason to believe" findings. Jennings asserted this finding was a technical requirement, and she believed B.H.M. when he told her he did not call because he believed that if M.M. found out he called, she would deny him access to the girls, putting them in more danger.

The girls went back to M.M.'s home in early April 2009. After the girls were returned to M.M., B.H.M. spent two-to-three nights a week at M.M.'s house, and the girls and M.M. then came to his house most of the other nights of the week. B.H.M. testified he was generally responsible for the girls' care, feeding them and making sure they were bathed and ready for school. M.M. attended Alcoholics Anonymous meetings in the evenings. On May 5, 2009, approximately a month after the girls were returned to M.M., B.H.M. went over to M.M.'s house, bringing her coffee. He then took his daughter to school. After he took his daughter to school, he had to take his boys to their great-grandmother's funeral. As he was walking into the funeral services around 12:00 p.m., he received a call from M.M. B.H.M. said he reminded M.M. that he was at the funeral. M.M. apologized and they hung up. This was the last time B.H.M. spoke with M.M. After the funeral, he tried to call M.M., but she did not answer. As M.M.'s house was on the way, he decided to drive by before going to Fort Sam Houston for the burial portion of the funeral services.

When B.H.M. saw M.M.'s truck in the driveway, B.H.M. dropped the boys off at his house, and then went back to M.M.'s house–this was around 2:00 p.m. B.H.M. said he entered the house, went back to M.M.'s bedroom, and found her sitting on her bed, folded over at the waist. He screamed at her, but got no response. He testified she had a plastic bag over her nose and mouth, and she was purple. B.H.M. stated he tried to clear her airway and resuscitate her but

could not.  He called 911.  After emergency services arrived, he called C.E.M.-K.'s school and asked them to hold her there until his son could pick her up.  Later, the medical examiner ruled M.M.'s death an accident, the result of "toluene toxicity."[1]

After M.M.'s death, C.E.M.-K. remained with B.H.M.  On June 26, 2009, he filed an application to be appointed C.E.M.-K.'s guardian.  The application identified J.P.K. as C.E.M.-K.'s biological father.  Several of M.M.'s relatives signed waivers and consented to B.H.M.'s appointment as guardian.  In response, J.P.K. filed a special appearance and plea to the jurisdiction, arguing exclusive jurisdiction remained in the Hays County court, which signed the original divorce decree.  J.P.K. also requested to be appointed C.E.M.-K.'s permanent guardian. The probate court appointed an attorney ad litem for C.E.M.-K.

On or about September 9, 2009, J.P.K. filed a petition for writ of habeas corpus in a Bexar County district court pursuant to section 157.372(a) of the Texas Family Code.  That section provides that if the right to possession of a child is governed by a court order, the court in a habeas corpus proceeding shall compel return of the child to the relator if the court finds relator is entitled to possession pursuant to that court order.  TEX. FAM. CODE ANN. § 157.372(a) (West 2008).  This section has been interpreted to mean the writ must be granted and the child returned to the person with a superior right of possession unless the relator has consented or acquiesced in actual possession and control of the child for six months or more, or there is a serious immediate question concerning the child's welfare.  *Green v. Schuble*, 654 S.W.2d 436, 438 (Tex. 1983); TEX. FAM. CODE ANN. §§ 157.373(a), 157.374.  B.H.M., of course, relied upon the exceptions,

---

[1] Toluene is commonly used as an industrial solvent in the manufacture of paints, chemicals, pharmaceuticals, and rubber.  Nathanael J. McKewon, D.O., *Toluene Toxicity* (last visited Feb. 3, 2011, 4:59 p.m.), http://emedicine.medscape.com/article/818939-overview.  "Toluene is found gasoline, acrylic paints, varnishes, lacquers, paint thinners, adhesives, glues, rubber cement, airplane glue, and shoe polish."  *Id*.  Toxicity can result from unintentional or deliberate inhalation of fumes.  *Id*.  Toluene abuse, i.e., "glue sniffing," has become widespread because of its availability and low cost.  *Id*.  It is commonly abused by soaking a rag with paint or other substance containing toluene and placing over the nose and mouth and inhaling.  *Id*.  It gives the user a sensation of euphoria.  *Id*.  "Sudden sniffing death" has been reported.  *Id*.

arguing the court should not return C.E.M.-K. to J.P.K. based upon the 2002 divorce decree, but should make temporary orders allowing B.H.M. to keep C.E.M.-K. until all issues were resolved. The probate court entered an order transferring the writ proceeding filed in the Bexar County district court to probate court. After a hearing, the probate court denied J.P.K.'s petition for writ of habeas corpus, entering temporary orders providing that C.E.M.-K. remain with B.H.M., but allowing visitation by J.P.K. and his current wife at their temporary residence in Wimberley, Texas.

B.H.M. and the ad litem subsequently filed original petitions seeking to have the custody of C.E.M.-K. determined by the court; B.H.M. filed his in Hays County, and the ad litem filed in Bexar County. J.P.K. filed answers to these petitions, seeking custody on his own behalf, and challenging B.H.M.'s standing. As it had with the writ proceeding, the probate court transferred the Hays County proceedings to the probate court. After all the transfer orders were complete, all proceedings relating to custody of C.E.M.-K. were under the jurisdiction of the probate court.

In addition to the pleadings filed by the various parties interested in conservatorship of C.E.M.-K., M.M.'s estate filed a motion to enforce the 2002 child support order, seeking continued payment of child support as well as a judgment for arrearages for the child support J.P.K. admittedly failed to pay. J.P.K. essentially conceded the child support issues.

For three days in December of 2009, a bench trial was held in the probate court concerning conservatorship of C.E.M.-K. There was testimony from a court-appointed psychologist, Jack Gordon Ferrell Jr., who had no criticisms of either B.H.M. or J.P.K., opining C.E.M.-K. was developing a life-long attachment with J.P.K. and his current wife, which is very positive for the child, and C.E.M.-K. views B.H.M. as her father-figure. He cautioned, however, that it would not be in C.E.M.-K.'s best interest to immediately move to Florida, and that it

would result in damage to her emotional state "for a period of time." Ferrell was also concerned about removing C.E.M.-K. from her half-sister because they are extremely close.

There was also testimony from J.P.K. and B.H.M., each testifying as to why C.E.M.-K. should stay with them. J.P.K. emphasized that he was C.E.M.-K.'s father as opposed to a former stepfather. He noted that the disruption in his relationship with C.E.M.-K. was M.M.'s fault, and that he was unable to challenge her given her family's wealth and his lack of finances. B.H.M., on the other hand, testified that C.E.M.-K. considered him her father, and she was extremely close to his entire family, especially C.E.M.-K.'s half-sister. B.H.M. pointed out the ties C.E.M.-K. has to San Antonio, including her friends, school, and extended family.

On cross-examination of each man, the other side attempted to show their weaknesses as potential custodians. J.P.K. pointed out the fact that B.H.M. provided alcohol to M.M. despite knowing she was an addict, assaulted M.M., and was the subject of a "reason to believe" finding of neglect as to C.E.M.-K. and his daughter by the Department. B.H.M. emphasized that by early 2005, J.P.K. had given up all efforts with regard to a relationship with C.E.M.-K., never calling, sending cards, or sending gifts. Additionally, he noted J.P.K. had stopped paying child support in mid-2004. B.H.M. intimated it was only when J.P.K. learned that C.E.M.-K. was to inherit a large fortune that he returned to seek a relationship with his daughter. J.P.K. likewise insinuated that B.H.M.'s interest stemmed from C.E.M.-K.'s inheritance.

After considering the evidence and arguments of counsel, the probate court awarded sole managing conservatorship to B.H.M., C.E.M.-K.'s former stepfather. J.P.K. was named possessory conservator, and awarded standard visitation under the Texas Family Code. J.P.K. and his wife moved from Florida to Houston to more easily accommodate the visitation

schedule. The estate was granted a judgment as to child support arrearages, which J.P.K. does not contest.

J.P.K. has appealed the trial court's judgment with regard to conservatorship, essentially arguing: (1) the trial court erred in awarding conservatorship of C.E.M.-K. to B.H.M. because B.H.M. failed to establish standing under the Texas Family Code, rendering the judgment void; and (2) the trial court erred in awarding primary possession to B.H.M., a non-parent, and failing to award primary possession to J.P.K., C.E.M.-K.'s biological father.

## ANALYSIS

### *Standing*

J.P.K. first contends the trial court erred in awarding conservatorship of C.E.M.-K. to B.H.M., a former stepfather, because B.H.M. lacked standing. B.H.M. responds that he established standing pursuant to section 102.003(a)(9) of the Texas Family Code, having had possession of C.E.M.-K. for more than six months ending within 90 days of suit being filed.

The question of who has standing to bring a suit affecting the parent-child relationship is a threshold issue. *In re Y.B.*, 300 S.W.3d 1, 4 (Tex. App.—San Antonio 2009, pet. denied) (citing *In re S.S.J.-J.*, 153 S.W.3d 132, 134 (Tex. App.—San Antonio 2004, no pet.)). Standing is not merely a statutory bar, but is a component of subject-matter jurisdiction. *In re H.G.*, 267 S.W.3d 120, 124 (Tex. App.—San Antonio 2008, pet. denied) (citing *Tex. Ass'n of Bus. v. Tex. Air control Bd.*, 852 S.W.2d 440, 444-45 (Tex. 1993)). A court cannot act if it does not have subject-matter jurisdiction, and if it does, any action taken is void. *H.G.*, 267 S.W.3d at 124 (citing *Mapco, Inc. v. Forrest*, 795 S.W.2d 700, 703 (Tex. 1990)). If a party lacks standing, the trial court is deprived of subject-matter jurisdiction. *H.G.*, 267 S.W.3d at 124.

"The Texas Legislature has provided a comprehensive statutory framework for standing in the context of suits involving the parent-child relationship." *Id*. (citing TEX. FAM. CODE ANN. §§ 102.003, 102.004, 102.0045, 102.005, and 102.006 (West 2008)). When there is a statutory framework for standing, a standing analysis is conducted within that framework. *H.G.*, 267 S.W.3d at 123.

The party seeking relief must allege and establish standing within the parameters of the statutory language. *Id*. In the family law context, when the petitioner is statutorily required to establish standing with "satisfactory proof, the applicable evidentiary standard is a preponderance of the evidence. *In re A.M.S.*, 277 S.W.3d 92, 96 (Tex. App.—Texarkana 2009, no pet.); *Von Behren v. Von Behren*, 800 S.W.2d 919, 921 (Tex. App.—San Antonio 1990, writ denied). Whether the party has established standing is a question of law, which we review de novo. *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 646 (Tex. 2004); *S.S.J.-J.*, 153 S.W.3d at 134. When, as here, the trial court does not make separate findings of fact and conclusions of law, we imply the findings necessary to support the judgment. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). We review the entire record to determine whether the implied findings are supported by any evidence. *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 853 (Tex. 2000).

B.H.M. alleged, and contends he proved, standing pursuant to section 102.003(a)(9) of the Texas Family Code. That section provides that, "a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months, ending not more than 90 days preceding the date of the filing of the petition has standing." TEX. FAM. CODE ANN. § 102.003(a)(9). The purpose of this section is to "create standing for those who have developed and maintained a relationship with a child over time." *Y.B.*, 300 S.W.3d at 4. A determination

of standing under section 102.003(a)(9) is fact specific, and must be resolved on a case-by-case basis. *Id.* It should be noted that in computing the six month period under section 102.003(a)(9), the time need not be "continuous and uninterrupted." TEX. FAM. CODE ANN. § 102.003(b). Rather, the court shall consider the child's principal place of residence during the relevant time period. *Id.*

J.P.K. seems to contend B.H.M. lacked standing because the evidence showed B.H.M. had "care, control, and possession" of C.E.M.-K. for only three months, from December of 2008, when the Department removed the child from M.M. and placed her with B.H.M., to March of 2009, when he claims the Department returned the child to M.M..[2] J.P.K. wholly discounts the time period from M.M.'s death, May 5, 2009, to September of 2009, when J.P.K. filed his writ of habeas corpus under the Family Code, or November 2009, when the first "original" petition in a suit affecting the parent-child relationship was filed by B.H.M.. J.P.K. suggests the time period following M.M.'s death should not be included in the six-month computation because upon M.M.'s death, J.P.K. was entitled to custody of C.E.M.-K. Whether he was entitled to possession at that time or not, we hold it was B.H.M. who had "care, control, and possession" after M.M.'s death. J.P.K. has not cited any authority establishing the period of time following M.M.'s death should be ignored simply because B.H.M. might not have been entitled to possession–the fact was, B.H.M. had possession of C.E.M.-K. following M.M.'s death.

Our review of the evidence, despite J.P.K.'s claims, shows B.H.M. had "care, control, and possession" of C.E.M.-K. from December 9, 2008 to the first week of April 2009. This was

---

[2] J.P.K. also makes reference to B.H.M.'s failure to prove standing under section 102.003(a)(11), which governs standing in the event a child's guardian, managing conservator, or parent is deceased, and section 102.004(b), which governs standing by grandparents and other intervenors. *See* TEX. FAM. CODE ANN. §§ 102.003(a)(11), 102.004(b). However, B.H.M. never alleged standing under either of these section in his pleadings, though he does argue on appeal that section 102.003(a)(11) is an alternate ground for standing. Given that he did not allege this ground in his pleadings, it will not support standing. *See H.G.*, 267 S.W.3d at 123.

the time period in which the Department removed C.E.M.-K. and her half-sister from M.M. and placed them with B.H.M. pursuant to a safety plan. This gave B.H.M. "care, control, and possession" of C.E.M.-K. for approximately four months. Then, it is undisputed that after M.M.'s death on May 5, 2009, and until J.P.K. filed the writ of habeas corpus and obtained visitation in September 2009, B.H.M. had sole and exclusive "care, control, and possession" of C.E.M.-K. This second period adds another four months to the previous time period, for a total of at least eight months–and perhaps ten months if we count from the time of M.M.'s death to the date B.H.M. filed the first original petition in this case. Accordingly, we hold B.H.M. established standing by a preponderance of the evidence under section 102.003(a)(9).

## *Conservatorship*

With regard to whether the trial court erred in appointing B.H.M., rather than J.P.K., as sole managing conservator, we first must determine whether this action involving C.E.M.-K. was an original suit, which is governed by Chapter 153 of the Texas Family Code and contains a presumption in favor of biological parents, or a modification under Chapter 156 of the Texas Family Code, which contains no such presumption.[3] The parental presumption in Chapter 153 of the Texas Family Code applies only to original suits, and states that unless the court finds appointment of a parent or parents would not be in the best interest of the child because it would significantly impair the child's physical health or emotional development, the trial court shall appoint a parent as sole managing conservator. *See* TEX. FAM. CODE ANN. § 153.131; *In re V.L.K.*, 24 S.W.3d 338, 342-43 (Tex. 2000); *In re C.A.M.M.*, 243 S.W.3d 211, 215-16 (Tex.

---

[3] J.P.K. did not challenge the inapplicability of the parental presumption in modification actions on constitutional grounds. He did not raise any constitutional issues, either below or in this court, on this issue. Rather, he relies on the statutory scheme in the Texas Family Code, arguing this is an original action, not a modification. Accordingly, it would be inappropriate for this court to address the possible constitutional issues relevant to the parental presumption's absence from Chapter 156 of the Family Code because we are not permitted to consider unassigned error. *See Western Steel Co. v. Altenburg*, 206 S.W.3d 121, 124 (Tex. 2006) (holding that absent rare fundamental error, appellate court should refrain from deciding cases on legal errors not assigned by parties); *Allright, Inc. v. Pearson*, 735 S.W.2d 240, 240 (Tex. 1987) (same).

App.—Houston [14th Dist.] 2007, pet. denied). J.P.K, seeking the benefit of the presumption, argues this is an original action. Conversely, B.H.M. contends this is a modification, and therefore J.P.K. is not entitled to the parental presumption.

Despite J.P.K.'s contentions, we hold this is necessarily a modification given the 2002 divorce decree, the death of M.M., and B.H.M.'s pleadings. Our conclusion is based on the supreme court's opinion in *V.L.K.*, its subsequent interpretation, and the language in the Texas Family Code. *See In re V.L.K.*, 24 S.W.3d at 342-43; *In re P.D.M.*, 117 S.W.3d 453, 457-58 (Tex. App.—Fort Worth 2003, pet. denied); TEX. FAM. CODE ANN. § 156.002.

In *V.L.K.*, the court began by noting that "[a]fter a court makes an original custody determination, a party may move to modify that determination." *Id.* at 342 (citing TEX. FAM. CODE ANN. § 156.002). Here, "an original custody determination" as to conservatorship of C.E.M.-K. was made by the Hays County court in the 2002 divorce decree. Thus, the subsequent actions filed by B.H.M., the ad litem, and J.P.K. were, *per force*, modification actions. *See id*. However J.P.K. contends this cannot be a modification because B.H.M. had no conservatorship or possessory rights prior to the probate court's temporary orders after the hearing on the writ of habeas corpus. In other words, because B.H.M. was not a party to the original suit affecting the parent-child relationship, his suit must be considered an original suit. Thus, J.P.K. suggests, much as the petitioners did in *V.L.K.*, that application of the parental presumption, i.e., whether the suit is original or a modification, depends upon the identity of the parties. In *V.L.K.*, the supreme court rejected this argument, holding that a determination on the applicability of the parental presumption, i.e., whether a suit is original or a modification, does not depend upon the parties' identities, but the circumstances and the relief is sought. *See V.L.K.*, 24 S.W.3d at 342-43 (recognizing that Legislature did not impose different burdens on parents versus nonparents,

but imposed different burdens when suit is original versus modification). Thus, when there is any subsequent custody proceeding after an original determination of conservatorship, as here, the proceeding is a modification and the parental presumption does not apply, regardless of the parties involved. *In re P.D.M.*, 117 S.W.3d at 457-58 (citing *V.L.K.*, 24 S.W.3d at 342-43).

Although B.H.M. styled his pleadings as an original petition, and we have determined he has standing to file an original petition pursuant to section 102.003(a)(9), which governs standing in original suits, this does not determine the nature of the suit. *See, e.g., In re C.A.M.M.*, 243 S.W.3d at 217 (describing action to modify custody order after managing conservator's death as suit to modify); *P.D.M.*, 117 S.W.3d at 456 (holding provisions of Chapter 156 of Texas Family Code governing modifications clearly apply to suits that attempt to effect change in custody after entry of initial custody order); *see also State Bar of Tex. v. Heard*, 603 S.W.2d 829, 833 (Tex. 1980) (holding that courts look to substance of plea for relief to determine nature of pleading, not merely title of pleading). First, it is undisputed there was a prior custody determination under the 2002 divorce decree. Second, given B.H.M.'s standing under section 102.003(a)(9), he also had standing to file a modification. *See* TEX. FAM. CODE ANN. § 156.002(b) (stating that person or entity who, at the time of filing, has standing to sue under Chapter 102 may file suit for modification in court with continuing, exclusive jurisdiction).

As to his pleadings, B.H.M. filed for termination of J.P.K.'s parental rights and conservatorship of C.E.M.-K. in the Hays County trial court, the court of continuing, exclusive jurisdiction, asking "to modify the prior orders" and award him "sole custody" on the basis of M.M.'s death. Thus, B.H.M. was clearly seeking a modification. Moreover, it appears J.P.K. himself considered the proceedings to determine conservatorship of C.E.M.-K. a modification

action. In his writ of habeas corpus, by which he sought to obtain immediate custody of C.E.M.-K., J.P.K. specifically moved the court "to *modify* the prior orders of the Court contained in Cause No. 2000-1247," which was the 2002 divorce decree rendered by the Hays County court. (emphasis added). Accordingly, we hold the relief sought by B.H.M. and J.P.K. in this case is controlled by Chapter 156 of the Family Code governing modifications.

When J.P.K.'s remaining issues are considered, he essentially contends the trial court erred in appointing B.H.M. as managing conservator because (1) the evidence was insufficient to support the decision, and (2) B.H.M. was precluded from an appointment as managing conservator because of his history of family violence and his neglect of C.E.M.-K. and her half-sister. We shall address each contention in turn.

### *Sufficiency*

As this is a modification action under Chapter 156, it is well-established that the parental presumption relied upon so heavily by J.P.K. does not apply. *See, e.g., V.L.K.*, 24 S.W.3d at 342-43; *C.A.M.M.*, 243 S.W.3d at 215-16; *P.D.M.*, 117 S.W.3d at 457-58; *In re A.D.H.*, 979 S.W.2d 445, 447 (Tex. App.—Beaumont 1998, no pet.). Rather, that presumption applies only to original suits. *See id*; *see also* TEX. FAM. CODE ANN. § 153.131. Accordingly, we must review the trial court's conservatorship decision under Chapter 156, which provides that modification of a prior court order regarding conservatorship is appropriate if the modification would be in the best interest of the child, and "the circumstances of the child, conservator, or other party affected by the order have materially and substantially changed since . . . the date of the rendition of the order." TEX. FAM. CODE ANN. § 156.101 (West Supp. 2010).

Generally, orders arising from a suit affecting the parent-child relationship will not be overturned on appeal unless the complaining party demonstrates a clear abuse of discretion by

the trial court. *C.A.M.M.*, 243 S.W.3d at 214 (citing *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990)). More specifically, we review a decision to modify conservatorship for a clear abuse of discretion. *In re R.H.H.*, No. 04-09-00325-CV, 2010 WL 2842905, at *3 (Tex. App.—San Antonio Jul 21, 2010, no pet.) (mem. op.) (citing *Worford*, 801 S.W.2d at 109; *In re Guthrie*, 45 S.W.3d 719, 727 (Tex. App.—Dallas 2001, pet. denied)). An abuse of discretion occurs when a trial court acts arbitrarily, unreasonably, or without regard to guiding principles of law. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex. 1985). A trial court does not abuse its discretion if there is some evidence of substantive and probative character to support its decision. *Vardilos v. Vardilos*, 219 S.W.3d 920, 921 (Tex. App.—Dallas 2007, no pet.). Moreover, a trial court is in the best position to observe the witnesses and their demeanor, and therefore is given great latitude in determining a child's best interests. *R.H.H.*, 2010 WL 2842905, at *3 (citing *Garner v. Garner*, 200 S.W.3d 303, 306 (Tex. App.—Dallas 2005, pet. denied)).

When the proper standard of review is abuse of discretion, challenges to the legal and factual sufficiency of the evidence are not independent grounds of error; rather, they are simply factors in determining whether the trial court abused its discretion. *Gardner v. Gardner*, 229 S.W.3d 747, 751 (Tex. App.—San Antonio 2007, no pet.); *London v. London*, 192 S.W.3d 6, 14 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). Therefore, an appellate court must engage in a two-prong analysis and determine "(1) whether the trial court had sufficient information upon which to exercise its discretion; and (2) whether the trial court erred in its application of discretion." *Gardner*, 229 S.W.3d at 751; *Sotelo v. Gonzales*, 170 S.W.3d 783, 787 (Tex. App.—El Paso 2005, no pet.). Once we determine whether sufficient evidence exists, we must then decide whether the trial court's decision was reasonable. *Sotelo*, 170 S.W.3d at 787.

In undertaking this analysis, the appellate court uses the traditional standards of review for legal and factual sufficiency. *Gardner*, 229 S.W.3d at 751. In considering the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005); *City of San Antonio v. Kopplow Dev., Inc.*, No. 04-09-00403-CV, 2010 WL 4336172, at *3 (Tex. App.—San Antonio Nov. 3, 2010, no pet.). We also indulge every reasonable inference that would support the factfinder's finding. *City of Keller*, 168 S.W.3d at 822. The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827.

In a factual sufficiency review, we consider all the evidence supporting and contradicting the trier-of-fact's finding. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Kopplow Dev., Inc.*, 2010 WL 4336172, at *3. We set aside the factfinder's finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) ); *Kopplow Dev., Inc.*, 2010 WL 4336172, at *3. The reviewing court cannot substitute its conclusions for those of the factfinder. If there is sufficient competent evidence of probative force to support the factfinder's decision, it must be upheld. *Carrasco v. Goatcher*, 623 S.W.2d 769 (Tex. App.—El Paso 1981, no writ). It is not within the province of this court to interfere with the factfinder's resolution of conflicts in the evidence or to pass on the weight or credibility of the witness's testimony. *Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792 (1951). Where there is conflicting evidence, the factfinder's decision on such matters is generally regarded as conclusive. *Clark v. National Life & Accident Ins. Co.*, 145 Tex. 575, 200 S.W.2d 820, 821 (1947).

Suits such as the one before us are "intensely fact driven," and therefore the supreme court has developed numerous factors relevant to a best interests consideration: (1) the child's desires, (2) her emotional and physical needs now and in the future, (3) any emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking primary possession, (5) the programs available to assist these individuals to promote the child's best interest, (6) the plans for the child by those seeking primary possession, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). In the specific context of modification of conservatorship, courts also consider the child's need for stability, and the need to prevent constant litigation regarding conservatorship of the child. *V.L.K.*, 24 S.W.3d at 343; C.A.M.M., 243 S.W.3d at 221.

Given the absence of the parental presumption, the applicable standards of review, the *Holley* and *V.L.K.* factors, and the evidence as set forth in the background portion of this opinion, we hold the probate court had sufficient evidence upon which to base its decision, and the probate court did not abuse its discretion in awarding sole managing conservatorship of C.E.M.-K. to B.H.M. as opposed to J.P.K.. The evidence was undisputed that C.E.M.-K.'s circumstances, as well as that of her former conservator "materially and substantially changed" since the date of the 2002 order determining conservatorship. *See* TEX. FAM. CODE ANN. § 156.101 This is obvious–the original conservator, C.E.M.-K.'s mother, died. Moreover, there was evidence modification would be in C.E.M.-K.'s best interest, and that her interests would best be served by remaining with B.H.M., the only father-figure she has really ever known, and

within the community where she has stability and support through school, friends, and extended family.  *See id.*

### *Family Violence/Findings of Neglect*

J.P.K. next contends the probate court erred in appointing B.H.M. as managing conservator because his appointment was precluded by section 153.004(b) of the Texas Family Code.  That section states, in pertinent part:

> The court may not appoint joint managing conservators if credible evidence is presented of a history or pattern of past or present child neglect, or physical . . . abuse by one parent directed against the other parent . . .

TEX. FAM. CODE ANN. § 153.004(b).  In support of his argument, J.P.K. first points to the "reason to believe" findings by the Department.  After the Department's first visit to the B.H.M.-M.M. home, B.H.M. was required to report to the Department if he became aware that M.M. was drinking again; admittedly, he did not.  Therefore, when the Department visited M.M.'s home in December 2008 and found M.M. drinking again, the Department was technically required, according to the testimony of the Department investigator, Jerusha Jennings, to issue a "reason to believe" finding that B.H.M. had negligently supervised and physically neglected C.E.M.-K. and her half-sister.  B.H.M. explained, however, that although he was aware he was required to report M.M. to the Department, he did not do so out of fear that M.M. would discover any report, and cut him off from the girls.  Even though M.M. was drinking, B.H.M. was able to watch over them and protect them.  B.H.M. testified that if M.M. became angry and denied him access to the girls, they would be in greater danger.  In essence, he testified he was faced with a Hobson's

Choice.[4]   B.H.M.'s testimony regarding his dilemma was supported by Jennings's testimony. Jennings testified the "reason to believe" findings as to B.H.M. were technical, a Department requirement given the first abuse report in the spring of 2008.  Jennings asserted that although she was technically required to make the findings, she believed B.H.M. when he told her he did not call because he believed that if M.M. found out he called, M.M. would deny him access to the girls, placing them in greater danger.  Given the testimony, we hold the probate court, in its discretion, could have concluded there was no "history or pattern of past or present child neglect" under section 153.004(b).  Moreover, in a modification proceeding, the best interest of the child is always the trial court's primary concern, and B.H.M.'s explanation, supported by Jennings's testimony, was sufficient for the probate court to conclude that despite the "reason to believe" findings in 2008, it was still in C.E.M.-K.'s best interest to be placed with B.H.M..

J.P.K. also points to the fact that B.H.M. was placed on deferred adjudication for his alleged assault of M.M..   J.P.K. contends this precluded B.H.M.'s appointment as managing conservator pursuant to section 153.004(b).  We disagree.  B.H.M. testified that in the 2006, he came home one evening and found M.M. drunk and angry.  He stated that after dinner, he heard his youngest son screaming and found M.M. beating his son.  B.H.M. admitted grabbing M.M. by the neck, dragging her out of the room, and slapping her.  M.M. called the police and filed a report.  B.H.M. testified the girls were not present when this occurred, but were asleep in their room.  B.H.M. admitted he was arrested a year later based on the confrontation with M.M., but was placed on deferred adjudication, which he successfully completed.  The terms of his deferred

---

[4] A "Hobson's choice" is one in which a person is required to accept one of two or more equally objectionable alternatives.  WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 574 (1990).  The phrase is attributed to the actions of Thomas Hobson, a 1631 English liveryman, who required every customer to choose the horse closest to the door. *Id.*

adjudication required he attend an anger management class, from which B.H.M. stated he learned to deal with such situations.

Although a single act of violence can constitute a "history" of physical abuse for purposes of section 153.004(b), we hold B.H.M.'s actions in this case are not the sort that would preclude his appointment as managing conservator. In the case of *In re R.T.H.*, the El Paso Court of Appeals was presented with a similar claim as that asserted by J.P.K.. *See* 175 S.W.3d 519 (Tex. App.—El Paso 2005, no pet.). In *R.T.H.*, a father sought a modification of conservatorship, seeking to be named the joint managing conservator with the sole right to determine his child's primary residence. *Id*. at 520. The trial court denied the requested modification, and the father appealed claiming the trial court erred in denying his petition because he presented "'credible evidence . . . of a history or pattern of past or present . . . physical . . . abuse.'" *Id*. (quoting TEX. FAM. CODE ANN. § 153.004(b)). The father claimed the child's mother, who had the current exclusive right to determine the child's primary residence, assaulted him. *R.T.H.*, 175 S.W.3d at 520. The father pointed to testimony from the modification hearing that the mother came to his apartment and assaulted him by "punching [him] and grabbing [him] by the neck and scratching [him]." *Id*. The father explained the mother was attempting to enter his apartment, and he was trying to keep her out. *Id*. The father testified the child did not see the exchange, because the father's girlfriend had taken the boy to the bathroom–the father was afraid the mother would try to remove the child from his apartment. *Id*. The father called police, and the mother was arrested and taken to jail. *Id*. Later, a magistrate issued a protective order against the mother in favor of the father. *Id*. The father also testified the mother had assaulted him on two other occasions, but he did not provide any details with regard to these assaults. *Id*.

The mother testified at the hearing, admitting she shoved the door and hit the father.  She stated she pled no contest to criminal trespass.  *Id*.  The mother, like B.H.M., was placed on deferred adjudication.  *Id*.

Upon review, the court held that although the evidence would justify a modification of conservatorship, the trial court was not compelled to order a modification.  *Id*.  The appellate court noted the mother presented evidence that she successfully completed her deferred adjudication, and had successfully completed a batterer's intervention and parenting classes.  *Id*.  The court also referred to the Department caseworker's report that there would have to be a compelling reason to move the child from the home he has always lived in.  *Id*.  The appellate court concluded the trial court's implied finding that it would be in the best interest to leave the child with the mother was supported by the evidence.  *Id*.

Here, the evidence is undisputed that M.M. was drunk and angry and B.H.M. found her beating his youngest son.  B.H.M.'s actions were taken in direct response to the violent actions of M.M.; he did not instigate the violence.  Like the mother in *R.T.H.*, he successfully completed his deferred adjudication, attending the mandated anger management classes.  Moreover, B.H.M.'s assault of M.M. was in 2006, approximately three years before M.M.'s death and, after the assault, the couple continued to care for one another and parent the children together.

Finally, the psychologist testified it would not be in C.E.M.-K.'s best interest at that time to remove her from her sister, B.H.M., and the life she has always known.  Given the evidence, we hold the trial court's implied finding that it would be in C.E.M.-K.'s best interest to remain with B.H.M. was supported by the evidence, despite the 2006 incident that resulted in B.H.M.'s arrest and deferred adjudication.

**CONCLUSION**

Based on the foregoing, we hold: (1) B.H.M. had standing under section 102.003(a)(9) of the Texas Family Code; (2) the action involving C.E.M.-K. was a modification as opposed to an original suit, thereby precluding application of the statutory parental presumption; and (3) the trial court did not abuse its discretion in naming B.H.M. as C.E.M.-K.'s sole managing conservator. As to conservatorship, we therefore overrule J.P.K.'s issues, and we affirm the trial court's judgment. In addition to naming B.H.M. C.E.M.-K.'s sole managing conservator, the trial court also granted judgment as to a child support arrearage action brought by C.P.M., Dependent Administrator of the Estate of M.M.. J.P.K. did not raise any issues relevant to the trial court's judgment on the arrearages, and therefore that portion of the judgment is affirmed as well.

Marialyn Barnard, Justice