**Opinion filed August 29, 2014**



In The

# Eleventh Court of Appeals

_____

## No. 11-13-00252-CV

_____

## IN THE INTEREST OF J.L.C., A CHILD

**On Appeal from County Court at Law**

**Brown County, Texas**

**Trial Court Cause No. 00-01-005**

## M E M O R A N D U M   O P I N I O N

Appellants, Jimmy and Carla, appeal a modification order in which the trial court removed them as joint managing conservators of their grandson, J.L.C. In six issues, Jimmy and Carla challenge the evidence to support the trial court's ruling. We affirm.

Jimmy and Carla are the maternal grandparents of J.L.C. Their daughter, Prissi, is J.L.C.'s mother. J.L.C.'s father relinquished his parental rights. When

Prissi married in 2005, Prissi and Jimmy and Carla agreed to be joint managing conservators of J.L.C. with Prissi having the right to determine the child's primary residence. Carla testified that they reached this agreement so that the child would be covered by Jimmy's insurance. J.L.C. was six years old at that time. Although the order contained a possession schedule, the parties agreed to their own fifty-fifty possession arrangement.

In 2011, Jimmy and Carla petitioned for a modification in which they asked to be named J.L.C.'s managing conservators with the right to designate his primary residence. Prissi counter-petitioned and asked the trial court to remove Jimmy and Carla as joint managing conservators. The trial court issued a temporary restraining order in which Prissi was ordered not to remove J.L.C. from Jimmy and Carla's possession and not to withdraw him from school.

The trial court held a hearing in October 2012 to determine issues regarding managing conservatorship. Jimmy and Carla sought to establish that they should be the managing conservators with the right to designate J.L.C.'s primary residence because of Prissi's history of abusive relationships and because she moved frequently. Prissi had asked the court to remove Jimmy and Carla as joint managing conservators, and it was her position that Jimmy and Carla continually undermined her ability to set boundaries and to discipline her child.

During the hearing, Prissi testified that she would take away J.L.C.'s privileges when he was failing a class and would only grant those privileges again once J.L.C. was passing. Jimmy and Carla admitted that they allowed J.L.C. to play video games when Prissi had grounded him from playing video games, but Carla explained that she thought being grounded for six weeks "[was] a bit excessive." When asked if she and Jimmy supported Prissi when she grounded J.L.C., Carla said, "Not for six weeks at a time, no, ma'am, I [d]on't." When asked if they allowed J.L.C. to play video games or play with friends when he was

2

grounded by Prissi, Jimmy said, "What she does in her house is her business. What I do in my house is my business."

When J.L.C. met with the trial judge in chambers during the October 2012 hearing on temporary orders, he told the trial court that Jimmy and Carla took away his phone when he got into trouble. The judge asked J.L.C. whether his punishments ever lasted more than a day, and J.L.C. said that it depended on what he did. When asked to describe a recent example, however, J.L.C. said, "Well, nothing lately."

Jimmy testified that J.L.C. was disciplined but explained that "you don't discipline [a child with ADHD] the same way you do a child that doesn't have it" and that he had "read countless books on this and so forth." Jimmy did not believe that a child with ADHD should be put in the corner or spanked because "they take it as that you are being aggressive towards them." Jimmy and Carla instead explain their expectations and take away J.L.C.'s phone and television privileges. Carla testified that "we have decided that when [J.L.C.] is mad at us, or we are mad[ ] at him, we will just go to separate rooms until we get calm, and then we'll talk." Carla said, "Usually what happens is, I tell him, 'You go to your room until you calm down and can talk to me correctly.' And, when he does calm down, he comes and apologizes, because his anger is not at me, but he is taking it out on me."

Prissi testified that J.L.C. is angry and described his behavior as "unruly." J.L.C. takes medication for ADHD and has issues with anger management. Jimmy had been called by J.L.C.'s school on two occasions, once after J.L.C. shoved another child and once after J.L.C. traded with another student for a knife. Another time, J.L.C. destroyed property in the apartment complex, and Prissi grounded him. When Prissi tried to talk to J.L.C. about why he was angry, J.L.C. said that he hated Prissi and her boyfriend and that he had tried to commit suicide.

Prissi called the police. Mental health authorities recommended that J.L.C. be admitted for at least one week for behavioral health observation. Jimmy and Carla, however, checked him out after five days. Jimmy claimed that J.L.C.'s doctor and caseworker "could not give me any reasons to hold him any longer. And so, he was released to us." According to Prissi, Carla told her that J.L.C. threatened to throw a rock through the window and run away if they did not take him home.

At one point, because J.L.C. had been lying, had been manipulative, and had said that he would rather live in foster care, Prissi took J.L.C. to visit the Cherokee Home for Children. Prissi testified that Cherokee was a home for children who have anger management issues and mental illnesses. Prissi described J.L.C.'s behavior at that time and said that J.L.C. had threatened to beat up other children, to kill other children, and to beat up Prissi. On one occasion, J.L.C. swung a golf club at Prissi, but she caught it before it hit her. Prissi arranged to leave J.L.C. at Cherokee for thirty days, but Jimmy and Carla picked up J.L.C. and took him back to their house within twenty-four hours. Prissi checked him into Cherokee on two different occasions, and at the hearing, the parties ardently contested the reasons for placing him there. Jimmy and Carla claimed that J.L.C. got in the way of Prissi's relationships with men. Prissi claimed that J.L.C.'s behavior was out of control.

It was uncontested, however, that J.L.C. cursed at Prissi and at Jimmy and Carla. Prissi testified that she did not tolerate that behavior and disciplined J.L.C. but that Jimmy and Carla allowed him to curse. J.L.C. had also called Jimmy and Carla mean, fat, and old. When questioned about how much she monitored J.L.C.'s activities, Carla said that she could not monitor his Facebook account because she could not see everything that he posted. Carla also said that she tried to look at J.L.C.'s text messages on his cell phone but that his phone was "too advanced" for her to operate. The record shows that J.L.C. looked at pornography

4

on Jimmy and Carla's computer and watched inappropriate movies late at night after they went to bed. There was uncontroverted testimony that Jimmy and Carla bought a video game for J.L.C. in which the characters stole cars, ran over pedestrians, killed people, killed police officers, and raped women.

When Prissi dated a man named Mike, J.L.C. once called Mike a "Magid," which he said was "[a] male a-- grabber including d--k." Mike picked up J.L.C. by the straps on his backpack and asked J.L.C. why he would call him that name. Prissi said that J.L.C. would not answer and that Mike "just set him back down and walked away." J.L.C. immediately called Jimmy and Carla. Carla picked him up that night. J.L.C. told Jimmy and Carla that Mike had put him against the wall after picking him up by his backpack straps. J.L.C. had a scratch across his chest and a bruise. When Jimmy took J.L.C. to his counseling appointment the following day, J.L.C. told the counselor what he had told Jimmy and Carla. The counselor advised Jimmy to file a police report. When Jimmy relayed J.L.C.'s account to the police officer, Jimmy admitted that J.L.C. tended to exaggerate. The following day, Prissi took J.L.C. to Cherokee. According to Prissi, Mike never slammed J.L.C. against the wall.

Prissi testified that she did not want J.L.C. to have weapons due to his anger issues but that Jimmy bought him a pellet gun. J.L.C. also had knives and a machete and had bought a .22 caliber handgun that he later traded for a deer-hunting bow. A neighbor complained that J.L.C. was shooting at her house and at her animals, and Jimmy and Carla asked her for proof. The neighbor could not offer any. Jimmy called the police department and city hall and determined that pellet guns were not regulated like guns that use gun powder. But, "to make peace with the neighbors," Jimmy told J.L.C. that he should just shoot the pellet gun in the woods.

5

Carla testified at the hearing about her own mental health struggles and admitted that she had attempted suicide in 2009. Carla explained that she was beginning menopause, was not taking her medication correctly, did not understand what was happening to her, and had an empty nest. She also said that her eleven-month-old granddaughter had been raped. Carla received "intensive inpatient" treatment for a week and then two weeks of out-patient treatment. Carla learned that she was "co-dependent and an enabler." Carla attempted suicide again in 2010 because she was not seeing her counselor or implementing the things she had learned through counseling. She testified that, at the time of the hearing, she saw her medical doctor every three months and that this doctor oversaw her medication.

Jimmy and Carla claimed that Prissi's life had been "less than stable" because of several abusive relationships. Prissi married Ben when J.L.C. was four years old. They were married for approximately one year, during which Ben physically abused Prissi. Prissi divorced Ben when he "turned abusive" toward J.L.C. Prissi then married Marcus, whom she divorced a little over a year later when she discovered that Marcus had cheated on her. Next, Prissi began dated her high school sweetheart, Teddy. After dating for two years, the relationship ended when Teddy busted Prissi's lip. Prissi began dating Mike in 2009, and they dated for almost two years. She described Mike as verbally abusive. Prissi testified that Mike was not physically abusive during their relationship but that she obtained a protective order because he threw her across the room when she ended their relationship.

Prissi and Brett began dating in October 2011. Brett and Prissi grew up together and had known each other most of their lives. Brett took J.L.C. hunting and fishing and had introduced J.L.C. to his family. Brett had also taken J.L.C. to his family's property to "look for varmints" and do other "country kid stuff."

6

Prissi and Brett attended J.L.C.'s school functions, went out to eat for family dinners, went to the movies, and went to an amusement park. J.L.C. and Brett also liked to play video games together.

When Brett began a one-year internship in New York, Prissi's employer allowed her to transfer to a photo studio there. After Prissi and Brett moved into their two-bedroom apartment in New Jersey, Brett and J.L.C. began playing video games with each other over the internet. J.L.C. talked to Brett about things like J.L.C.'s new girlfriend. Carla testified that she liked Brett more than she liked any of Prissi's previous boyfriends.

Jason Henry, a lifelong friend of Brett and Prissi, testified that Brett treated J.L.C. like he was his own child and that Brett would never hit Prissi or J.L.C. Henry described J.L.C. as well-mannered and respectful around Prissi, but Henry testified that J.L.C. was disrespectful toward Jimmy and Carla and that they undermined Prissi on occasion. As an example, Henry said that he and Brett went to J.L.C.'s band concert and that, afterward, the group went out to eat and to Henry's apartment to play video games. J.L.C. became aggravated or moody later that night and was disrespectful. Prissi tried to talk to J.L.C. about it after they returned home, but J.L.C. locked himself in the bathroom and called Jimmy. Jimmy picked up J.L.C., and J.L.C. was never disciplined.

At the close of the October 2012 hearing, the trial court issued temporary orders. The trial court granted Jimmy and Carla the right to possession of J.L.C. through the remainder of the Fall 2012 semester, Christmas break, and during the spring vacation break. The trial court granted Prissi the right to possession of J.L.C. at all other times. The parties remained as joint managing conservators.

The trial court held a final hearing in July 2013. According to the record, J.L.C. had been grounded from his cell phone while living in New Jersey because he was failing classes. J.L.C. hid his phone, told Jimmy and Carla that he hid it

7

from Prissi, and told Prissi that he had lost it. Carla testified that she "went along with" this story because she believed it was important for J.L.C. to have a cell phone for safety. J.L.C. also sent pictures of a near-empty refrigerator to Jimmy and Carla and told them that he did not always have enough to eat; Carla started sending $20 to J.L.C. each week so that he would have money for food. Prissi testified that the picture J.L.C. sent may have been taken right before she went to the store and that she spends $600 on food each month. Prissi claimed that J.L.C. lies and manipulates Jimmy and Carla and that they spoil him and send him home rather than help her to parent.

The trial court denied Jimmy and Carla's request to be appointed as managing conservators with the right to designate residency, and it granted Prissi's petition to remove Jimmy and Carla as joint managing conservators. The trial court did not issue findings of facts or conclusions of law. In six issues on appeal, Jimmy and Carla challenge the evidence to support the trial court's ruling.

We review a trial court's decision to modify conservatorship for an abuse of discretion. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). A trial court abuses its discretion when it acts arbitrarily or unreasonably or when it fails to correctly analyze or apply the law. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985). It is not an abuse of discretion if some evidence of a substantive and probative character exists to support the trial court's decision. *Bates v. Tesar*, 81 S.W.3d 411, 424–25 (Tex. App.—El Paso 2002, no pet.). The factfinder is the sole judge of the credibility of the witnesses and the weight to be given to the testimony. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). Because the trial court is in the best position to observe the demeanor of the witnesses, it is given great latitude in determining the child's best interest. *In re Guardianship of C.E.M.-K.*, 341 S.W.3d 68, 80 (Tex. App.—San Antonio 2011, pet. denied).

In their third and fourth issues, Jimmy and Carla contend that the trial court failed to consider the wishes of the child because it did not conduct an in-chambers interview and because the guardian ad litem was not present at the hearing due to "'miscommunication' with the court." Jimmy and Carla specifically argue in their third issue that Section 153.009 of the Texas Family Code "imposes a duty upon the court" to interview the child because of the use of the term "shall." Prissi argues that the trial court had discretion to deny Jimmy and Carla's verbal request for an in-chambers interview because "there is no application in the clerk's record." We agree.

According to Section 153.009(a), the trial court "shall interview in chambers a child 12 years of age or older . . . to determine the child's wishes as to conservatorship" if a party, amicus attorney, or attorney ad litem for the child files an application requesting an interview. TEX. FAM. CODE ANN. § 153.009(a) (West 2014). Although the statute is mandatory and requires a trial court to interview a child on the application of any party, it is not an abuse of discretion to refuse to conduct an interview when there is no application on file. *See Hamilton v. Hamilton*, 592 S.W.2d 87, 88 (Tex. App.—Fort Worth 1979, no writ). Even if Jimmy and Carla had filed an application, the failure to conduct an in-chambers interview during the final hearing would have been harmless because the record shows that the trial court and parties were all aware that J.L.C. preferred to live with Jimmy and Carla, that the trial court had already interviewed J.L.C. in chambers during the hearing on temporary orders, and that J.L.C. testified and was cross-examined about his preference and the factual disputes. Jimmy and Carla's third issue is overruled.

In their fourth issue, Jimmy and Carla argue that "[t]he Guardian ad Litem should have been present at trial." Section 107.002 of the Texas Family Code establishes the "Powers and Duties of Guardian ad Litem for Child."

FAM. § 107.002. The legislature has given guardians ad litem the power to do certain activities and requires them to do others. Subsection (c) provides that a guardian ad litem "is entitled to . . . attend all legal proceedings in the case." *Id.* § 107.002(c). Section 107.002 does not require the attendance of the guardian ad litem at all hearings, and Jimmy and Carla did not call the guardian ad litem as a witness. While guardians ad litem have a right to be present, Jimmy and Carla cite no authority and we find none that requires the trial court to ensure the appearance of the guardian ad litem at a hearing. Even if we are incorrect, Jimmy and Carla have not met their burden to show how the alleged error probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a). Accordingly, Jimmy and Carla's fourth issue is overruled.

In their first two issues, Jimmy and Carla maintain that the trial court committed reversible error when it applied the parental presumption because the presumption does not apply to modification suits. Jimmy and Carla direct us to the record where the trial court referenced the parental presumption when it issued the temporary orders at the October 2012 hearing.

The trial court's comments are not findings of fact or conclusions of law, and we cannot look to those statements as a substitute. *In re W.E.R.*, 669 S.W.2d 716, 716 (Tex. 1984) (per curiam). When a trial court does not make findings of fact and conclusions of law, as in this case, we must draw every reasonable inference in favor of the trial court's judgment that can be supported by the record. *See Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). We will uphold the trial court's ruling if it is correct under any legal theory that is supported by the evidence. *Id.*

Nonetheless, when the appellate record includes the reporter's record, the implied findings are not conclusive and may be challenged for legal and factual sufficiency of the evidence. *Gainous v. Gainous*, 219 S.W.3d 97, 103 (Tex.

App.—Houston [1st Dist.] 2006, pet. denied). Jimmy and Carla challenge the factual sufficiency of the evidence in their fifth and sixth issues, so we consider these issues along with their first and second issues.

Challenges to the sufficiency of the evidence are not independent grounds of error in custody determinations but are relevant factors in assessing whether the trial court abused its discretion. *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied). In a suit to modify the parent-child relationship, the traditional sufficiency standards of review overlap the abuse of discretion standard, and appellate courts apply a two-prong analysis: (1) whether the trial court had sufficient information upon which to exercise its discretion and (2) whether the trial court erred in applying its discretion. *Child v. Leverton*, 210 S.W.3d 694, 696 (Tex. App.—Eastland 2006, no pet.); *Zeifman v. Michels*, 212 S.W.3d 582, 588 (Tex. App.—Austin 2006, pet. denied). In a factual sufficiency challenge, we consider all of the evidence and set aside the findings only if they are so contrary to the overwhelming weight of the evidence as to be clearly wrong or manifestly unjust, conscience-shocking, or clearly biased. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Jimmy and Carla challenge the factual sufficiency of the evidence to support the trial court's determination that appointing Prissi as sole managing conservator was in J.L.C.'s best interest because "[u]ndisputed evidence was presented by both parties of the domestic violence and instability of the child's mother." Jimmy and Carla detail the evidence of Prissi's relationships with Ben, Teddy, and Mike. Our review of the record shows that Prissi was married to Ben in 2004 when J.L.C. was four years old, later dated Teddy for two years, and then dated Mike in 2009 and 2010. The record shows that she began dating Brett in 2011 and that, at the final hearing, they had been dating for almost two years. There was no evidence that any violence had ever occurred between Brett and Prissi or between Brett and

11

J.L.C.  Indeed, Carla testified that she liked Brett more than anyone Prissi had previously dated.  Brett's friend testified that he had known Brett for more than thirty years and that Brett treats J.L.C. "like his own son"; that he is "very, very good with [J.L.C.]"; and that Brett is a "really good person to look up to."  Thus, although there was evidence of past domestic violence and instability, there was no evidence of violence in the two years prior to the modification order.

Jimmy and Carla argue that, because the public policy in Texas is to "provide a safe, stable, and nonviolent environment for the child," it was an abuse of discretion to remove them as conservators because "[t]he undisputed evidence presented by Prissi in this case described an unstable home where the only constant was changing schools regularly and bringing in abusive men."  Jimmy and Carla argue that granting Prissi's petition to remove them as joint managing conservators "was so blatantly in conflict with the public policy of this state that the appellate court must conclude that an abuse of discretion occurred."

Jimmy and Carla are correct that it is the public policy of this state that children have a safe, stable, and nonviolent environment.  *See* FAM. § 153.001(a)(2).  But it is also the public policy in Texas "that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child."  *Id.* § 153.001(a)(1).  Although Prissi and J.L.C. changed residences and school districts five times in eight years, the evidence shows that the moves were because of Prissi's abusive relationships.  The record also shows that, at the time of the final orders, Prissi had been in a stable relationship for almost two years.  Regardless of the stability of her home in the past, the record shows that, at the time of the hearing, she had demonstrated the ability to act in the best interest of the child.  *See id.* § 153.001(a)(1).  Moreover, considering the evidence of Prissi's relationship with Brett and their home with J.L.C., we cannot conclude that the trial court's decision to appoint Prissi as sole

managing conservator violated the public policy of ensuring a "safe, stable, and nonviolent environment." *See id.* § 153.001(a)(2).

A trial court may modify an order in a suit affecting the parent-child relationship if the circumstances have materially and substantially changed and if modification would be in the best interest of the child. FAM. § 156.101(a). We review a trial court's best interest finding with the aid of the *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These non-exhaustive factors include: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the plans for the child by these individuals, (6) the stability of the home, (7) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (8) any excuse for the acts or omissions of the parent. *Id.*

Although there is not evidence in the record as to every factor, it was clear that J.L.C. preferred to live with Jimmy and Carla. Both homes appear to be loving and supportive, so the second and third factors do not weigh in favor of either party. Jimmy and Carla admitted that they do not support Prissi's decisions as to J.L.C.'s discipline and that J.L.C. calls Jimmy and Carla when he is in trouble with Prissi. Moreover, evidence that Jimmy and Carla encouraged J.L.C. to lie to Prissi about his cell phone is an indicator of an improper parent-child relationship.

After reviewing the entire record and considering all of the evidence, we cannot conclude that the trial court's ruling was so contrary to the overwhelming weight of the evidence that it was clearly wrong or conscience-shocking. *See Cain*, 709 S.W.2d at 176. Accordingly, Jimmy and Carla's first and second issues on appeal, as well as their last two issues, are overruled.

13

We affirm the judgment of the trial court.

JIM R. WRIGHT

CHIEF JUSTICE

August 29, 2014

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.