Opinion filed January 31, 2013



In The

# Eleventh Court of Appeals

No. 11-11-00354-CV

## IN THE INTEREST OF B.A.G., A CHILD

**On Appeal from the County Court at Law No. 2**

**Ector County, Texas**

**Trial Court Cause No. CC2-15,284**

## MEMORANDUM OPINION

This case involves a suit affecting the parent-child relationship brought by nonparents in which the trial court dismissed the suit for lack of standing. The principal issues presented in this appeal are (1) what is the relevant time period for assessing whether a party has had six months of "actual care, control, and possession" of a child under Section 102.003(a)(9) of the Texas Family Code and (2) whether the nonparents had "actual care, control, and possession" for the requisite six months. TEX. FAM. CODE ANN. § 102.003(a)(9) (West Supp. 2012). The trial court looked only to the sixth-month plus ninety-day period that immediately preceded the filing of the petition. We disagree with the trial court's construction, reverse its judgment in which it dismissed appellant's suit for lack of standing, and remand for further proceedings.

The material facts are undisputed. B.A.G. was born in 1999. Chad Edward Gray and Marsha Bartlett are B.A.G.'s parents. In 2002, Bartlett, Gray, and B.A.G.'s paternal

grandmother, Rhonda Scott, were appointed joint managing conservators of B.A.G. The trial court named Scott as the joint managing conservator who had the exclusive right to designate the child's primary residence within Ector County, Texas. Scott, however, resided in Harlingen, Texas, and she designated the home of B.A.G.'s great-grandparents, Theron and Jimmy, as B.A.G.'s primary residence. In its agreed final decree of divorce, the trial court ordered that child support be paid to Scott in the amount of $313.86 each month; Gray and Bartlett were each responsible to pay one-half of that amount. In addition, at Scott's behest, the trial court ordered that Bartlett submit to and pay for random urinalysis.

Carrie Ann and Dennis Lynn Shaver's son and B.A.G. were friends from school, and the Shavers initially met and got to know Jimmy and Theron when the boys wanted to stay overnight together. Later, in July 2009, Theron had a stroke, and B.A.G. began primarily living with Carrie and Dennis. During this time, and although B.A.G. was living with Carrie and Dennis, Jimmy took B.A.G. to church with her on Sundays and Wednesdays. After Theron returned home from the hospital, B.A.G. went back to Jimmy and Theron's home. However, Theron's feeding tube upset B.A.G., and he quickly returned to live in the Shavers' home. Theron died in December 2009.

After Theron's death, both Jimmy and B.A.G. struggled to adjust. During this time, B.A.G. spent three to four nights each week with Jimmy, but both Jimmy and B.A.G. had a lot of "down days." When he began staying with the Shavers, B.A.G. initially brought a backpack of clothes with him, but as the need arose, the Shavers purchased additional clothes and toys. Jimmy also left her home unlocked so that B.A.G. could get additional things to take to the Shavers' at any time. The Shavers cared for B.A.G. half of the time from Theron's death in December 2009 until Jimmy had a stroke in May 2010. Jimmy called the Shavers on her way to the hospital and asked them to care for B.A.G. B.A.G.'s paternal aunt, Melissa Kelley, later asked the Shavers to keep B.A.G. until the end of the school year. Kelley picked up B.A.G. on the last day of school, and B.A.G.'s furniture was moved from Jimmy's house to Kelley's house.

A week later, the Shavers picked up B.A.G. to leave for their family vacation on Memorial Day weekend. Scott called the Shavers and said that B.A.G.'s mother would pick him up for visitation when they returned. Although she did not advise the Shavers, Scott intended for B.A.G. to stay with Bartlett. Later that night, however, Bartlett called the Shavers crying. She was hysterical because B.A.G. was upset; B.A.G. had never lived with her and had always been

2

told that he could not be around his mother. B.A.G.'s teacher testified at the hearing that B.A.G. had confided that his mother called him "some very ugly names" in the past. But from June until August 2010, B.A.G. lived with Bartlett during the week and visited the Shavers on weekends. The child's belongings remained with the Shavers, and B.A.G.'s furniture was never moved from Kelley's home. B.A.G. began sixth grade at a local school, but when Child Protective Services "got involved" two weeks into the school year, Scott removed him from Bartlett's care and directed that B.A.G. live with his father.

As Scott directed, B.A.G. moved in with Gray, and B.A.G. returned to his previous school. After the first night, Gray phoned the Shavers and asked for their continued help with B.A.G.'s care because Gray worked long hours. The Shavers picked up B.A.G. from school each day and ensured that he finished his homework. B.A.G. did not move any of his clothing and personal items to Gray's home. The Shavers had B.A.G. for six nights each week because, when they called, Gray usually said that he had to work late or meet a customer or had another excuse; Carrie testified that she eventually quit calling. This pattern continued until Gray's girlfriend moved in around Halloween 2010.

From Halloween 2010 until March 2011, while Gray's girlfriend lived in their townhome, B.A.G. spent weekends at the Shavers' home. Gray's girlfriend picked up B.A.G. from school and ensured that he did his homework. When Gray and his girlfriend later separated, though, Gray left B.A.G. with Kelley. Carrie testified that she received "a phone call a week later, asking if I'll take [B.A.G.] back in my home." B.A.G. went back to live with the Shavers on March 24, 2011, where he remained until the trial court made its first ruling.

The Shavers filed suit to be appointed managing conservator on May 17, 2011, and the trial court held a hearing on June 7, 2011. At the hearing, Scott's testimony was short because she had little personal knowledge of the events in Ector County. After the trial court heard extensive testimony from Carrie and testimony from Dennis and B.A.G.'s teacher and talked with B.A.G. in chambers, the trial court deferred making a final ruling. The trial court entered temporary orders that B.A.G. remain with the Shavers, and it also ordered that B.A.G. spend one week with Scott in Harlingen. The court noted that it was familiar with the Shavers' circumstances because they had recently finalized an adoption in the same court, but it ordered that a study be conducted on Scott's home. The trial court also ordered Bartlett and Gray to report immediately to provide a hair follicle sample to screen for controlled substances.

3

Although Scott never had actual possession of B.A.G., she received the child support checks for B.A.G.'s care; Scott agreed to refrain from cashing any child support checks until the trial court ruled. The court explained that it would interview B.A.G. after his one-week visit with Scott in Harlingen and that it would notify the parties of its final ruling after that interview.

Ultimately, the trial court found that the Shavers lacked standing under the Texas Family Code, granted Scott's motion to dismiss, and ordered the Shavers to deliver B.A.G. to Scott's possession on August 18, 2011. The Shavers filed another petition to modify the parent-child relationship the following day and asked the trial court to appoint them either as B.A.G.'s sole managing conservators or joint managing conservators with the right to designate residency. The trial court held a second temporary hearing on November 10, 2011, to determine whether the Shavers had standing. The court heard limited testimony offered to clarify the dates that Gray's girlfriend lived in their townhome and Kelley's periods of possession. After a brief recess to consider the arguments and case law, the trial court again found that the Shavers lacked standing and granted Scott's motion to dismiss. The Shavers appeal the trial court's ruling on their second petition.

"Standing is implicit in the concept of subject matter jurisdiction." *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). And determining whether a trial court has "subject matter jurisdiction is a question of law." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004) (citing *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002)). Thus, we apply the same de novo standard of review that we apply to subject matter jurisdiction. *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 646 (Tex. 2004); *accord Tex. Ass'n of Bus.*, 852 S.W.2d at 445–46. When we review a trial court's order regarding standing, our analysis begins with the plaintiff's live pleadings, and we construe the pleadings in favor of the plaintiff. *Tex. Ass'n of Bus.*, 852 S.W.2d at 446 (citing *Huston v. Fed. Deposit Ins. Corp.*, 663 S.W.2d 126, 129 (Tex. App.—Eastland 1983, writ ref'd n.r.e.)). We must then consider evidence that the parties offered and relied on "to resolve the jurisdictional issues raised, as the trial court is required to do." *Miranda*, 133 S.W.3d at 227 (citing *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547 (Tex. 2000)). Standing to bring a claim is a question of law that we review de novo. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998); *N. Alamo Water Supply Corp. v. Tex. Dep't of Health*, 839 S.W.2d 455, 457 (Tex. App.—Austin 1992, writ denied).

4

The Shavers contend that the trial court erred when it determined standing based only on the six months plus ninety days immediately preceding the date that they filed their petition because B.A.G.'s principal residence had been in the Shavers' home for the last two years. In response, Scott argues that the period of "actual care, control, and possession" must be for a consecutive six-month period that immediately precedes suit. Therefore, before we determine whether the Shavers had six months of actual care, control, and possession, we must first determine the relevant time period to use in an assessment of the time period for which a person has care, control, and possession of a child under the Texas Family Code.

Although there are certain general principles that are involved in standing inquiries, when standing is conferred by statute, "the statute itself serves as the proper framework for a standing analysis." *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 851 (Tex. App.—Fort Worth 2005, no pet.); *see also Tex. Dep't of Protective & Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001) (applying the statutory framework to determine standing under Family Code); *see, e.g., Hunt v. Bass*, 664 S.W.2d 323, 324 (Tex. 1984) (explaining that the "general rule of standing is applied in all cases absent a statutory exception to the contrary"). "The Texas Legislature has provided a comprehensive statutory framework for standing in the context of suits involving the parent-child relationship." *In re H.G.*, 267 S.W.3d 120, 124 (Tex. App.—San Antonio 2008, pet. denied); *see also* TEX. FAM. CODE ANN. §§ 102.003, .0045, .005 (West Supp. 2012), §§ 102.004, .006 (West 2008). The party seeking relief has the burden to establish standing within that framework. *H.G.*, 267 S.W.3d at 124.

To the extent that the issue turns on statutory construction, we review the question de novo. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008). Our primary purpose is to give effect to the intent of the legislature, and where the text is clear, it is dispositive of that intent. *Id.* Our construction begins with the plain meaning of the statute's words. *City of Sunset Valley*, 146 S.W.3d at 642. "Words and phrases shall be read in context and construed according to the rules of grammar and common usage." TEX. GOV'T CODE ANN. § 311.011(a) (West 2005). But when there is "a technical or particular meaning, whether by legislative definition or otherwise," we construe those words or phrases accordingly. *Id.* § 311.011(b). We read the statute as a whole rather than consider isolated portions, and we must give effect to every part. *Acker v. Tex. Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990); *Ex parte Pruitt*, 551 S.W.2d

706, 709 (Tex. 1977). Moreover, we presume that the legislature acts with knowledge of court decisions and the common law. *Phillips v. Beaber*, 995 S.W.2d 655, 658 (Tex. 1999).

The Texas Supreme Court has not construed the current version of Section 102.003(a)(9), but in 1998, it construed a former version, which had been recently recodified, to require that the six-month period of possession immediately precede the date of filing of the suit involving the parent-child relationship. *Jones v. Fowler*, 969 S.W.2d 429, 433 (Tex. 1998). As recodified, former Section 102.003(9) granted standing to "a person who has had actual care, custody, and possession of the child for not less than six months preceding the filing of the petition." *Id.* at 431. The construction turned on whether the legislature intended to amend the subsection substantively because, among other changes, it had deleted the word "immediately" before "preceding." *Id.* at 433. The court seemed to agree with commentators that the purpose of the "immediately preceding" requirement was to "require expeditious action," which vested discretion in the trial court to determine what was reasonable. *Id.* (quoting John J. Sampson, *Standing to Sue in a SAPCR*, STATE BAR OF TEX., ADVANCED FAMILY LAW COURSE B-1, B-12 (1986)). In 1999, however, the legislature added a ninety-day window within which a person who lost "actual care, control, and possession" must file suit, as well as subsection (b) to guide courts when calculating time of possession. *See* Act of May 30, 1999, 76th Leg., R.S., ch. 1390, § 2, 1999 TEX. GEN. LAWS 4696.

Now, Section 102.003(a)(9) confers standing to a person "who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition." Section 102.003(a)(9). "In computing the time necessary for standing under Subsections (a)(9), (11), and (12), the court may not require that the time be continuous and uninterrupted but shall consider the child's principal residence during the relevant time preceding the date of commencement of the suit." *Id.* § 102.003(b).

When it determined that the Shavers lacked standing, the trial court expressly stated in its conclusions of law that it did not consider "any periods of possession by the SHAVERS prior to December 19, 2011, which is six months plus ninety (90) days prior to the date of filing of the (second) Petition to Modify." Appellants argue that, after the 1999 amendment by which the legislature added Section 102.003(b), parties may accumulate separate periods of possession to reach a total of six months, so long as the last day of that six- month period was not more than ninety days before the party filed suit.

6

Reading the statute as a whole, we first note that, of the fourteen subsections conferring standing, subsection (b) applies only when "computing the time necessary for standing under Subsections (a)(9), (11), and (12)." *Id.* § 102.003(b). Subsection (a)(12) grants standing to foster parents; subsection (a)(11) grants standing to stepparents or other persons with whom the child and the child's parent have resided; and subsection (a)(9) applies to third parties who care for the child. *Id.* § 102.003(a)(9), (11), (12); *see also Doncer v. Dickerson*, 81 S.W.3d 349, 357 (Tex. App.—El Paso 2002, no pet.) (discussing standing under the three subsections). Because the legislature instructed courts—only in three defined circumstances—to determine "the child's principal residence" rather than requiring that the period be "continuous and uninterrupted," it seems to have contemplated that foster parents, stepparents, and third-party caregivers are all parties who may not have exclusive or continuous custody. Section 102.003(b).

Scott argues that the periods of possession must be consecutive and must immediately precede the filing. Scott cites *In re Kelso*, 266 S.W.3d 586 (Tex. App.—Fort Worth 2008, no pet.), for the proposition that the six months must be consecutive and *Rupert v. McCurdy*, 141 S.W.3d 334, 340 (Tex. App.—Dallas 2004, no pet.), to support her contention that the period must immediately precede the filing. In *Kelso*, the court of appeals concluded that the grandparents lacked standing because "the evidence presented at the temporary orders hearing fails to show that the [grandparents] had actual care, control, and possession of the child for six *consecutive* months." 266 S.W.3d at 587–88 (emphasis added). The court reasoned, however, that the grandparents had not established actual control during the period of possession because the child's mother continued to make decisions for the child—not because the period of possession was not consecutive. *Id.* at 590. It further reasoned that there was no evidence that the mother intended that the child stay with the grandparents for extended periods. *Id.* at 591. Similarly, although the court of appeals in *Rupert* stated that the proper inquiry was whether the nonparent had actual care, control, and possession "for the six-month period immediately before he filed his petition," it determined that the nonparent lacked standing because he waited five months after the mother and child moved out of his residence to seek possessory conservatorship. 141 S.W.3d at 340, 341. Scott does not direct us to other post-1999 amendment cases that support her position.

The Shavers argue that their home had been B.A.G.'s principal residence since July 2009 and rely on *Doncer*, 81 S.W.3d 349; *In re C.E.M.-K.*, 341 S.W.3d 68 (Tex. App.—San Antonio

7

2011, pet. denied); and *In re M.K.S.-V.*, 301 S.W.3d 460 (Tex. App.—Dallas 2009, pet. denied). Scott urges us to disregard *Doncer* because there the court assessed standing under Section 102.003(a)(11). We disagree, however, and find *Doncer* instructive when we construe Section 102.003(b), that portion of the statute that guides courts in determining standing under Section 102.003(a)(9), (11), and (12). In *Doncer*, the El Paso Court of Appeals construed "principal residence" in a case in which a child's stepmother sought conservatorship after the death of the child's father. *Doncer*, 81 S.W.3d at 351. The court there distinguished the legislature's use of the term "principal residence" as opposed to its use of the term "primary residence." *Id.* at 361. If a child spends his time between more than one household, then a parent or the managing conservator with the right to designate the primary residence, as is the case here, usually has the unilateral right to designate the child's "primary residence." *Id.* at 359. Because the legislature used "primary residence" eleven times in the Family Code, the court determined that it would have used that phrase if it intended to predicate standing on the child's "primary residence." *Id.* at 360. Instead, it selected the term "principal residence," which it uses only three times, all of which relate to jurisdiction and venue to determine where a child "resides." *Id.* at 359. The court applied the following definition of residence that is used under the general civil statutes: a fixed, permanent abode that is intended to be occupied "consistently over a substantial period of time." *Id.* at 361 (citing *Snyder v. Pitts*, 241 S.W.2d 136, 140 (Tex. 1951)).

An informal custody agreement can evince intent for a child to occupy consistently the home of a nonparent over a substantial period of time. *See M.K.S.-V.*, 301 S.W.3d at 465. In *M.K.S.-V.*, two women decided to have a child after cohabiting for six years, and the biological mother conceived through artificial insemination and use of a sperm donor. *Id.* at 462. When the relationship ended, the women agreed to a visitation schedule that was similar to a standard possession order. *Id.* at 465 (citing TEX. FAM. CODE ANN. § 153.312 (West 2008)). During the school year, the child visited the nonbiological mother one night each week, alternate Sunday afternoons, alternate weekends, and some holidays, and the child had longer visits during the summer months. *Id.* at 465. The child had her own room, television, and toys, and the nonbiological mother picked up the child from school when sick, attended school activities, and established a college fund. *Id.* In addition, the school was aware that the nonbiological mother picked up the child during visitation periods, and witnesses observed the biological mother

8

treating the other as a parent of the child. *Id.* The court concluded from the possession agreement and parties' actions that from August 5, 2005, to April 25, 2007, the nonbiological mother had six months of "actual care, control, and possession." *Id.* at 462. Although the case turned on whether the arrangement was intended to be temporary, it instructs us that a person who shares custody with another may nonetheless have standing if the arrangement shows an intent that the child occupy the home consistently over a substantial period of time.

Similarly, in *M.P.B.*, a woman who kept her grandchild once a week and on weekends, holidays, and vacations over a seventeen-month period had standing because she had provided the child with a permanent residence that the child occupied consistently over a substantial period of time. *In re M.P.B.*, 257 S.W.3d 804, 809 (Tex. App.—Dallas 2008, no pet.). The court distinguished the grandmother's care from possession that facilitates "inability to provide child care" because such care is a temporary arrangement. *Id.*

Additionally, a child's "principal residence" may change over several periods of time, and a person asserting standing may aggregate separate periods of possession. *See C.E.M.-K.*, 341 S.W.3d at 78. In *C.E.M.-K.*, when the child was five years old, she lived with her mother and stepfather, two stepbrothers, and a new half sister. *Id.* at 72. Unfortunately, C.E.M.-K.'s mother had a serious alcohol addiction, and the couple later divorced. *Id.* at 73. When the Texas Department of Family and Protective Services required the mother to seek alcohol treatment, the former stepfather cared for all four children from December 9, 2008, until the first week of April 2009. *Id.* at 73, 77, 79. A month after she completed treatment and regained possession of the children, the mother overdosed and died. *Id.* at 74. In September 2009, C.E.M.-K.'s biological father filed a writ of habeas corpus to obtain visitation rights, and two months later, the former stepfather filed an original petition seeking conservatorship. *Id.* at 74–75. The father challenged the stepfather's standing on appeal, but the court concluded that the stepfather had standing because he had a combined eight or ten months of actual "care, control, and possession." *Id.* at 78. The court reached this conclusion because it combined the four months, from December 2008 to April 2009, while the mother was in treatment, with another four or six months after the mother's death on May 5, 2009, depending on whether one uses the date of the father's September filing or the former stepfather's filing in November. *Id.*

We conclude that the trial court erred when it construed "the relevant time" to be used to calculate standing as the consecutive six months plus ninety days before the date that the suit was

filed. Instead, the relevant period of time includes the periods of possession that the petitioner's home was the child's "principal residence," even if not consecutive. *See* Section 102.003(b). In a three-part analysis, courts should first determine the child's principal residence, so it must examine the parties' actions and the possession arrangement to determine whether the child was intended to consistently reside in the petitioner's home "over a substantial period of time." *M.K.S.-V.*, 301 S.W.3d at 465; *M.P.B.*, 257 S.W.3d at 809. Next, the party asserting standing must have had "actual care, control, and possession" for a total of six months during the periods in which that party's home was the child's principal residence. *See* Section 102.003(a)(9). In some circumstances, a standard possession order alone may establish both the "principal residence" and "actual care, control, and possession," but because the focus is on "actual" care, control, and possession rather than legal authority, that is not always the case. Finally, the petitioner must file suit while having "actual care, control, and possession" or within ninety days of losing such possession of the child. *Id.*

The Shavers contend that their home has been B.A.G.'s primary residence since July 2009 because, "[w]hen the trial periods with the mother and the father failed, and the aunt determined that she could not care for B.A.G., the child always returned to the residence of the SHAVERS." The parties conceded at the hearing that B.A.G. never resided with Scott, who had been granted the right to determine the child's primary residence. Thus, we review the various periods of shared possession to determine whether the Shavers' home was B.A.G.'s principal residence.

The five-month period after the death of B.A.G.'s great-grandfather, from December 2009 until May 2010, suggest a shared custody or co-parenting arrangement between the Shavers and Jimmy. B.A.G. stayed with the Shavers while Theron was dying, and B.A.G. returned to the Shavers' home after Theron's death, where he stayed fifty percent of the time. Jimmy had just lost her spouse and struggled with "down days," and the Shavers emotionally supported both Jimmy and B.A.G. after their loss. B.A.G. left his clothes and other possessions at the Shavers' home when he stayed with Jimmy. Jimmy left the back door of her home unlocked so that the Shavers would always have access. The Shavers took B.A.G. to and from school, and they helped him with his science fair project. Although the school did not officially recognize the Shavers as having authority over B.A.G., it nonetheless released B.A.G. to the Shavers and provided Carrie with his final report card.

10

The three months that B.A.G. spent with his mother, from June 2010 through August 2010, appear to be a trial period. As part of the agreed divorce decree, the mother agreed to submit to random urinalysis upon Scott's demand, which we note as background information to assess the intent of the parties. B.A.G.'s furniture was moved to Kelley's home after Jimmy's stroke, but it was not moved to the mother's residence at any time.[1] When the mother called the Shavers on the first evening, she was "hysterical" and crying; B.A.G. was upset because he had always been told that "he couldn't go around her." Regardless, the Shavers were told that "[t]hey were going to give [the mother] a try with [B.A.G.]." Unfortunately, "CPS got involved," and Scott sent B.A.G. to live with Gray. The evidence suggests that B.A.G.'s interlude in his mother's home was intended to be a temporary or trial period.

Similarly, the time that B.A.G. spent with his father during September and October 2010 also suggests a trial period. After Gray had possession of B.A.G. for one night, he called the Shavers to ask for their continued help due to Gray's long work hours as a car salesman. B.A.G. spent up to six nights a week with the Shavers. Carrie testified that she called Gray "three or four nights" each week and that Gray would explain that "he had to work late to sign a customer or had to drive out of town. It compounded from there, so we would quit calling him." The Shavers picked up B.A.G. from school each day, ensured that he completed his homework, and provided him with food and clothes. The time that B.A.G. spent with the Shavers while Gray was at work could constitute child care and evince intent for a temporary arrangement, but Gray's actions before, during, and after this period of possession preclude such a conclusion. Gray lived in Jimmy's home before her death, but Carrie testified that Gray "was working all the time, partying, and not spending any time with [B.A.G.]." During his possession, Gray never moved B.A.G.'s furniture to Gray's residence,[2] and B.A.G. left his clothes and other possessions at the Shavers' home. While the Shavers had B.A.G. less often when Gray's girlfriend lived with him, when she moved out, Gray quickly left B.A.G. in Kelley's care. Carrie testified that Gray never called or visited B.A.G. during any of the periods that he stayed with the Shavers.

---

[1] The trial court stated in its findings of fact that the furniture was moved to Bartlett's home, but the only testimony relating to the furniture was that the furniture was moved from Jimmy's house to Kelley's house.

[2] Gray's attorney argued that the child's furniture had been moved to Gray's home, but there is no evidence in the record to support this argument. Carrie testified that the furniture was moved to Kelley's home, and neither Kelley nor Gray testified as to the furniture and whether it was moved again.

11

The evidence does not show that Gray intended to consistently care and provide for B.A.G. over a substantial period of time.

Finally, except for one week, B.A.G.'s principal residence from March 24, 2011, until the trial court's final order on August 18, 2011, was the Shavers' home. After B.A.G. was removed from Bartlett's care and relinquished by Gray, Kelley again called the Shavers and asked if they would "take [B.A.G.] back in [their] home" because she could not financially support the child. When Kelley testified, she agreed that B.A.G. had been bounced around before he finally landed at the Shavers' home. The parties do not seem to dispute that, during this period, the Shavers' home was B.A.G.'s principal residence. Moreover, the trial court temporarily ordered that B.A.G. remain with the Shavers, and except for the week B.A.G. spent in Harlingen, B.A.G. stayed with the Shavers until the trial court issued its final order. Thus, the Shavers' home was B.A.G.'s principal residence for an additional four-month period.

In addition to the possession arrangement, the parties' actions are evidence that the parties intended that B.A.G. consistently reside with the Shavers over a substantial period of time. For example, when Jimmy suffered a massive stroke in May 2010, she called the Shavers on the way to the hospital; Kelley later asked the Shavers to keep B.A.G. through the remainder of the school year, and they did. B.A.G. also joined the Shavers for a scheduled family vacation. When Scott sent B.A.G. to live with Bartlett under the guise of visitation, B.A.G. realized that on the first night and became upset; Bartlett called the Shavers for help. After Jimmy passed away, after CPS was involved with Bartlett, and after Kelley said she could not financially care for the child, B.A.G. was always returned to the Shavers. Thus, the Shavers' home constituted B.A.G.'s principal residence for at least six months, so we must assess whether the Shavers had "actual care, control, and possession" during these periods of time.

Scott argues that, "if the legislature had intended [Section] 102.003(b) to completely discard the requirement of continuous or consecutive periods [of] care, control, and possession immediately preceding the filing of a SAPCR petition," then the statute would say "*at all times preceding*" filing of suit instead of "the relevant time period preceding" filing of suit. At the temporary hearing and on appeal, Scott focuses on the period that B.A.G. primarily lived with Gray and his girlfriend to defeat the Shavers' standing. But Section 102.003(b) expressly instructs that "the court may not require that the time be continuous and uninterrupted." Thus, since the legislature's addition of Section 102.003(b), evidence of a break between periods of

12

possession does not defeat standing; instead, a substantial break is more probative as to the best-interest-of-the-child inquiry.

As discussed above, any person who has "actual care, control, and possession of the child for at least six months ending not more than [ninety] days preceding the date of the filing of the petition" has standing. Section 102.003(a)(9). The supreme court has warned the lower courts not to be "mechanistic" when analyzing standing under Section 102.003. *Jones*, 969 S.W.2d at 433. This requires a fact-specific analysis that we must resolve on a case-by-case basis. *In re Y.B.*, 300 S.W.3d 1, 4 (Tex. App.—San Antonio 2009, pet. denied). Many courts have concluded that the legislature intended to confer standing under this provision to a person who, over time, "developed and maintained a relationship with a child." *Id.* at 4; *see also In re A.C.F.H.*, 373 S.W.3d 148, 150 (Tex. App.—San Antonio 2012, no pet.); *Jasek v. Tex. Dep't of Family & Protective Svcs.*, 348 S.W.3d 523, 533 (Tex. App.—Austin 2011, no pet.); *C.E.M.-K.*, 341 S.W.3d at 77. We again note that, instead of looking for "continuous and uninterrupted" periods of possession, the child's principal residence controls. Section 102.003(b).

Requiring courts to consider the child's "principal residence" excludes a person from consideration who merely has occasional or temporary possession. *Doncer*, 81 S.W.3d at 359. Generally, courts have found "actual care, control, and possession" when the person asserting standing (1) lived in a home where the child consistently and frequently stayed overnight; (2) financially supported the child; (3) participated in the child's education; and (4) fed, clothed, and provided health care to the child. *Jasek*, 348 S.W.3d at 534 (citing *Smith v. Hawkins*, No. 01-09-00060-CV, 2010 WL 3718546, at *3 (Tex. App.—Houston [1st Dist.] Sept. 23, 2010, pet. denied) (mem. op.); *M.K.S.-V.*, 301 S.W.3d at 463–65; and *M.P.B.*, 257 S.W.3d at 809)). In contrast, a pattern of possession that facilitates "momentary housing difficulties, inconvenient travel schedules, the pursuit of higher education, or the inability to provide child care" is evidence of a temporary arrangement between parties. *M.P.B.*, 257 S.W.3d at 809. The statute does not require that the care, control, and possession be exclusive. *Jasek*, 348 S.W.3d at 534; *M.P.B.*, 257 S.W.3d at 809. While care, control, and possession are usually assessed together, some cases have turned on "actual control." *See Jasek*, 348 S.W.3d at 534; *In re K.K.C.*, 292 S.W.3d 788, 793 (Tex. App.—Beaumont 2009, orig. proceeding); *Kelso*, 266 S.W.3d at 590. Standing is predicated on "actual control" of the child, rather than who has the legal right of control. *Jasek*, 348 S.W.3d at 534; *M.P.B.*, 257 S.W.3d at 809.

During periods of custody constituting the child's "principal residence," the caregiver has "actual control" when the caregiver has the power or authority to guide or manage the child, regardless of whether there is legal authority. *See Jasek*, 348 S.W.3d at 537. For example, in *Jasek*, the third-party caregivers had "actual control" over the children even though the Texas Department of Family and Protective Services was the managing conservator with the legal decision-making authority over the children. *Id.* The Jaseks provided for the children's basic necessities and gave them love and support; they complied with the treatment plan prescribed by the children's doctor; they enrolled them in school; and they provided daily care, protection, and reasonable discipline. *Id.* Similarly, in *Reed*, although the grandparents did not have exclusive control, the court concluded that they had at least fifty percent of the control. *In re Reed*, No. 06-11-00066-CV, 2011 WL 3332105, *2 (Tex. App.—Texarkana Aug. 4, 2011, orig. proceeding) (mem. op). The grandparents lived next door to the mother and children, and the children spent a lot of time there; the grandparents took the children to and from school; and the grandparents cared for, fed, and clothed the children. *Id.* In contrast, in *K.K.C.*, a boyfriend who had been cohabiting with the child's mother did not have "actual control" because the mother made decisions for the child, even though the boyfriend resided with and cared for the child. *K.K.C.*, 292 S.W.3d at 793.

A party who shares custody with another may nonetheless have actual care, control, and possession. *See M.K.S.-V.*, 301 S.W.3d at 465. In *M.K.S.-V.*, as discussed above, the court considered the parties' actions and their informal custody agreement to assess whether the party had actual care, control, and possession. *Id.* The nonbiological mother took the child to the doctor, purchased medication, attended school activities, and established a college fund. *Id.* The child also had her own room, toys, and playground equipment. *Id.* Based on this evidence, the nonbiological mother had "actual control" sufficient to confer standing. *Id.*

Scott had the legal right of control over B.A.G. as a joint managing conservator and through her right to designate the child's primary residence within Ector County. Although the legal decision-making authority is not determinative, we note that Scott continually exercised her authority when she determined that B.A.G.'s primary residence should be with Jimmy and Theron, then B.A.G.'s aunt, then B.A.G.'s mother, and then B.A.G.'s father. But these relatives continually turned over care of B.A.G. to the Shavers. When confronted with caring for B.A.G. full-time, his mother called the Shavers crying because she did not know how to comfort the

14

hysterical child. Similarly, Gray did not participate in B.A.G.'s care while he and the child both lived with Jimmy and Theron, nor did he call or visit B.A.G. at any time when the child stayed with the Shavers. While B.A.G.'s visits to the Shavers' home were less frequent during the period that Gray's girlfriend lived with him, Gray swiftly left B.A.G. with Kelley when his girlfriend moved out. None of this is evidence that B.A.G.'s mother or father actually guided, managed, or controlled the child.

The Shavers' actions, however, show that they exercised actual care, control, and possession over B.A.G. for the requisite six months. The Shavers took B.A.G. to and from school, helped him with his homework, and helped him work on school projects. Although they were not listed as his guardians, the school staff released B.A.G. to the Shavers on a regular basis; they also released his grades to them. The Shavers communicated with his teacher and attended parent conferences. Carrie signed B.A.G.'s enrollment card when they selected his elective classes, and both Shavers signed his homework assignment book on various occasions. Additionally, the Shavers took B.A.G. for immunizations and paid for him to play hockey. They also purchased clothes and toys for B.A.G. without receiving any financial support from B.A.G.'s relatives. The Shavers also supported B.A.G. while he struggled to cope with losing Theron and then losing Jimmy, with whom B.A.G. had lived most of his life.

We hold that, as a matter of law, the Shavers had standing to file a suit affecting the parent-child relationship under Section 102.003(a)(9). While our conclusion that the Shavers have standing to bring suit does not mean that they will ultimately prevail, the Shavers have the right to be heard. We reverse the order of the trial court in which it dismissed the Shavers' petition, and we remand the cause to the trial court for further proceedings consistent with this opinion.

JIM R. WRIGHT
CHIEF JUSTICE

January 31, 2013

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.