**Opinion filed July 17, 2014**



In The

# Eleventh Court of Appeals

_____

## No. 11-13-00375-CV

_____

## IN THE INTEREST OF M.C.M., A CHILD

**On Appeal from the 266th District Court**
**Erath County, Texas**
**Trial Court Cause No. CV31544**

## M E M O R A N D U M   O P I N I O N

Appellant, Ryan Chase Mohler, appeals an order in which the trial court modified the parent-child relationship in relation to his son, M.C.M. He contends that the trial court abused its discretion when it imposed a geographical restriction on his right to determine the child's primary residence and that it erred when it entered an order that contained a different restriction from the court's oral pronouncement. For the reasons that follow, we reverse and remand.

Ryan and Beathaney Mohler were divorced on May 30, 2012, and both lived in Stephenville. They were appointed as joint managing conservators of their son, M.C.M. Ryan had the exclusive right to designate the primary residence of the

child without regard to geographic location. Ryan and Beathaney agreed that Beathaney would have possession of M.C.M. every Sunday through Tuesday and every other Friday through Tuesday. Other than holidays, Ryan had possession at all other times.

The following summer, Ryan enrolled M.C.M. in kindergarten in the Stephenville Independent School District. On August 13, 2013, however, Ryan learned that he had a new job and notified Beathaney that he intended to move with the child to San Angelo. Beathaney filed a petition on August 16, 2013, to modify the parent-child relationship. She asked the trial court to restrict the child's primary residence to Erath County. Beathaney also requested temporary orders that would restrict the residence of the child to Erath County.

On August 19, 2013, the trial court granted Beathaney's application for a temporary restraining order and ordered that Ryan could not withdraw M.C.M. from the school "where the child is presently enrolled." On August 17, 2013, two days before the entry of the temporary restraining order, Ryan told Beathaney that he had enrolled M.C.M. in a San Angelo school. On Tuesday August 20, 2013, Ryan moved to San Angelo. That same day, Beathaney spoke to a school official and determined that M.C.M. was still enrolled in Stephenville ISD. On Friday, August 23, 2013, Beathaney and Ryan met between Stephenville and San Angelo so that Beathaney could begin her visitation period; it was at this point that Ryan was served with notice of the temporary restraining order and the petition to modify.

According to Ryan, Beathaney agreed to meet again that Sunday and return M.C.M. to Ryan early so that M.C.M. could start school in San Angelo on Monday. But because the decree provided Beathaney with possession of M.C.M. until Tuesday at 1 p.m., Beathaney took M.C.M. to school in Stephenville that Monday and Tuesday. On Wednesday, August 28, 2013, the parties appeared for a

2

hearing on the temporary orders. A hearing was not held, but a final hearing was set for October 2, 2013. M.C.M. returned to San Angelo with Ryan and began kindergarten in San Angelo the following day.

At the final hearing in October, Ryan and Beathaney each testified that the other was a good parent. During the marriage, Ryan, Beathaney, and M.C.M. lived in a house across the street from a ranch owned by Ryan's parents. Ryan worked for his parents, and in return, they provided him with a house, a vehicle, and auto insurance. For additional money, Ryan was also "riding horses for the public." He said that he "was scraping by" on this income. Ryan found a job working for Laredo Petroleum in San Angelo. The job paid more and also provided health insurance to him and his family. Ryan testified that San Angelo is about 180 to 200 miles away from Stephenville. Although Ryan had lived in Stephenville for the previous fourteen years, he had lived in San Angelo as a child, and he had friends and family who lived there. Ryan's two best friends, his grandparents, cousins, and two sets of aunts and uncles lived in San Angelo, and Ryan's parents planned to move there as well to be closer to M.C.M.

At the hearing, Ryan told the trial court that he was concerned about Beathaney's ability to care for M.C.M. because she was not "involved in his schooling very much at all" and because of health problems associated with her pregnancy. M.C.M. went to preschool on Monday, Wednesday, and Friday each week, and Ryan said that his teacher "regularly approached" him with her concern that M.C.M. was missing "just about every single Monday." M.C.M.'s class had an agenda each week, and his teacher explained that missing Mondays made it hard for M.C.M. "because he would miss the very beginning stage." Beathaney had possession of M.C.M. every Monday. Ryan also said that Beathaney struggled with getting M.C.M. to school with the "correct stuff" when there was a school activity. Ryan testified that he was concerned that Beathaney had kidney stones

3

and was having complications during her pregnancy. According to Ryan, he worked with Beathaney while she was on "strict" bed rest, and he took M.C.M. to visit her while she was hospitalized during her period of possession.

Beathaney testified that the only days that M.C.M. missed school were when he was sick. She also testified about a time when M.C.M. had his tonsils and adenoids removed and was later hospitalized again after he began to vomit blood. Beathaney did not say how long M.C.M. was in the hospital, but she pointed out that Ryan never came to visit. Beathaney said that she took possession of M.C.M. during "every bit" of time designated for her in the divorce decree but that her husband returned M.C.M. early when she was hospitalized for kidney stones. Beathaney agreed that Ryan brought M.C.M. to visit her while she was hospitalized. Beathaney believed that residing in Stephenville was in M.C.M.'s best interest because "[t]his is where he's been his whole life."

The possession schedule in the decree provided that Ryan and Beathaney were to each have possession of M.C.M. approximately fifty percent of the time. Beathaney wanted to continue the previously agreed-to visitation schedule and proposed that Ryan's parents take the periods of possession in which Ryan is unable to visit M.C.M. Ryan proposed that they instead follow the standard possession order for parents who live more than 100 miles apart except that Beathaney would have M.C.M. on the second, fourth, and fifth weekends instead of on the first, third, and fifth weekends of each month. Ryan also requested that they alternate weeks of possession during the summer. After Ryan moved to San Angelo, he and Beathaney met in Bangs, which is about halfway between San Angelo and Stephenville, but a little closer for Beathaney.

Ryan and Beathaney both remarried in the month leading up to the final hearing, and they are each expecting their second child. Ryan's wife, Emily, testified that they were "struggling" financially in Stephenville. She also said that

they were more comfortable in San Angelo and that they all had health insurance now. They received daily reports from M.C.M.'s teacher in San Angelo who told Ryan and Emily that M.C.M. was doing wonderfully and had "no poor behavior." She also said that M.C.M. is "a very loving, happy kid"; has been doing "great in school"; and has "several friends." According to Emily, their greatest concern was ensuring that M.C.M. could visit his mother on a regular and consistent basis because "he loves his mom very much." Ryan goes to school functions and has even bought and delivered food for a teacher luncheon. Ryan and Emily share responsibility for getting M.C.M. to and from school, and Emily cares for M.C.M. when Ryan is working. Ryan testified that this was the same arrangement that had existed while he was working in Stephenville. Beathaney's husband did not testify.

At the close of the hearing, the trial court told the parties that it believed that a geographic restriction to Erath and contiguous counties was in the best interest of the child. The trial court asked Beathaney's attorney to prepare an order to that effect, and the order was submitted along with a motion to sign the order. Ryan filed objections to the proposed order, and the trial court held a hearing on the motion. Ryan's objections were based upon the fact that, in the trial court's oral pronouncement, the residence restriction permitted not only residence in Erath County but also in "contiguous counties." Further, the written order required M.C.M. to be "re-enrolled and remain within the Stephenville [ISD]," a condition not mentioned in the oral pronouncement. After reading the record of its remarks from the prior hearing, the trial court explained, "[W]hat I'm saying is you're not changing the deal on mom or the child, which has been working for the . . . first five years of the child's life and it's going to continue to work." The court explained that residing outside Erath County "would destroy the fifty-fifty working relationship that [Ryan and Beathaney] had in place," and the court ruled, "I'm

going to grant the motion to sign the order as it has been presented to me." It is from this order that Ryan appeals.

We first address Ryan's second issue on appeal. In that issue, he complains that the trial court erred when it granted Beathaney's motion to sign the written order because the geographic restriction contained in that proposed order did not reflect the oral pronouncement of the trial court.

The trial court retains plenary power to "vacate, modify, correct, or reform the judgment within thirty days after the judgment is signed." TEX. R. CIV. P. 329b(d). If the written judgment does not reflect the trial court's oral pronouncement, parties may file a motion to modify, correct, or reform the judgment to accurately reflect the trial court's decision. *See* TEX. R. CIV. P. 329b(g). "During this period, the trial court's power to modify its judgment is virtually absolute." *Stallworth v. Stallworth*, 201 S.W.3d 338, 349 (Tex. App.—Dallas 2006, no pet.). But before the trial court signs the judgment, it "can change the decision previously announced without any formal order setting it aside." *Kostura v. Kostura*, 469 S.W.2d 196, 198 (Tex. Civ. App.—Dallas 1971, writ ref'd n.r.e.).

At the hearing on Beathaney's motion, the trial court explained that it was further limiting the child's primary residence to Erath County and not to the contiguous counties and that it was also ordering the child to be enrolled in Stephenville ISD so that the parties could continue "the fifty-fifty working relationship that they had in place." Because the trial court can modify or change its previously announced ruling at any time prior to signing the judgment, it was not error to order a different geographic restriction than the one orally pronounced. *See id.* Accordingly, Ryan's second issue is overruled.

In his first issue, Ryan challenges the factual sufficiency of the evidence to support the trial court's finding that a geographic restriction was in the child's best

interest and argues that the trial court abused its discretion when it modified the divorce decree to impose a geographic restriction on his right to designate the primary residence of the child.

We review a trial court's decision to modify conservatorship for an abuse of discretion. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). A trial court abuses its discretion when it acts arbitrarily or unreasonably or when it fails to correctly analyze or apply the law. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985). It is not an abuse of discretion if some evidence of a substantive and probative character exists to support the trial court's decision. *Bates v. Tesar*, 81 S.W.3d 411, 424–25 (Tex. App.—El Paso 2002, no pet.). The factfinder is the sole judge of the credibility of the witnesses and the weight to be given to the testimony. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). Because the trial court is in the best position to observe the demeanor of the witnesses, it is given great latitude in determining the child's best interest. *In re Guardianship of C.E.M.-K.*, 341 S.W.3d 68, 80 (Tex. App.—San Antonio 2011, pet. denied).

Challenges to the sufficiency of the evidence are not independent grounds of error in custody determinations but are relevant factors in assessing whether the trial court abused its discretion. *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied). In a suit to modify the parent-child relationship, the traditional sufficiency standards of review overlap the abuse of discretion standard, and appellate courts apply a two-prong analysis: (1) whether the trial court had sufficient information upon which to exercise its discretion and (2) whether the trial court erred in applying its discretion. *Zeifman v. Michels*, 212 S.W.3d 582, 588 (Tex. App.—Austin 2006, pet. denied); *Child v. Leverton*, 210 S.W.3d 694, 696 (Tex. App.—Eastland 2006, no pet.). In a factual sufficiency challenge, we consider all of the evidence and set aside the findings only if they are so contrary

to the overwhelming weight of the evidence as to be clearly wrong or manifestly unjust, conscience-shocking, or clearly biased. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

A trial court may modify an order in a suit affecting the parent-child relationship if the circumstances have materially and substantially changed and if modification would be in the best interest of the child. TEX. FAM. CODE ANN. § 156.101(a) (West 2014). Both parties concede that the circumstances have materially and substantially changed and that the only issue is whether the evidence supports the trial court's ruling that a geographic restriction is in the best interest of the child.

We review a trial court's best-interest finding by using the *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These non-exhaustive factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the plans for the child by these individuals; (6) the stability of the home; (7) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (8) any excuse for the acts or omissions of the parent. *Id.*

In addition, when the trial court's finding involves relocation, we consider the factors identified by the Texas Supreme Court in *Lenz*, which include the following: (1) the relationship with and presence of extended family; (2) the presence of friends; (3) the presence of a stable and supportive environment; (4) the custodial parent's improved financial situation and ability to provide a better standard of living for the child; (5) the positive impact on the custodial parent's emotional state, with beneficial results to the child; (6) the noncustodial parent's right to have regular and meaningful contact; (7) the ability of the noncustodial

parent to relocate; and (8) the ability of the noncustodial parent to adapt his work schedule to the child. *Lenz v. Lenz*, 79 S.W.3d 10, 15–19 (Tex. 2002).

In his challenge to the factual sufficiency of the evidence, Ryan cites to the court's analysis in *Lenz* and argues that the *Lenz* factors "clearly weigh in favor of allowing [Ryan] to stay in San Angelo with the child." Beathaney argues that Ryan's reliance on the analysis in *Lenz* is misplaced because the court of appeals was reviewing the legal sufficiency of the evidence to support a jury's finding while Ryan raised a factual sufficiency challenge to the trial court's best-interest finding. According to Beathaney, "[m]uch more instructive than the *Lenz* analysis, in this case, are the opinions issued this year by two courts of appeals reviewing for an abuse of discretion, trial court decisions to modify a prior court order by imposing geographic restrictions on the primary residence of [the child.]" *See Downey v. Downey*, No. 03-12-00037-CV, 2014 WL 1362642 (Tex. App.—Austin April 1, 2014, no pet.) (mem. op.); *In re C.R.J.*, No. 06-13-00053-CV, 2014 WL 199209 (Tex. App.—Texarkana Jan. 17, 2014, no pet.) (mem. op.).

In *Downey*, the parents were joint managing conservators, and the father had the right to designate the primary residence of their two children. *Downey*, 2014 WL 1362642, at *1. After the divorce, the father's girlfriend began living with him, and the father quit his job to go back to school. *Id.* at *4. When the father decided to move closer to his school, the mother filed a petition to modify and asked the court to impose a geographic restriction to prevent the father from moving the children thirty minutes away from their mother, grandparents, and schools. *Id.* at *1, *4. In affirming the imposition of the geographic restriction, the appellate court referenced evidence in the record about the parties' motives for the relocation and the parties' change of residences since the divorce and noted that the trial court could consider how relocation would affect the children's stability. *Id.* at *4. However, the evidence that related to stability, changes in residence

9

since the divorce, and the parties' motives for and against the move is not detailed in the *Downey* court's opinion. Even so, the trial court could have determined from the facts outlined there that the limited financial and emotional improvement that would result from a shorter commute was outweighed by removing their mother, extended family, and friends from the daily life of the children. Evidence that relocation would have a negative effect on the children's stability would further support this conclusion.

In *C.R.J.*, the parents were joint managing conservators, and the mother had the right to designate their child's primary residence. *C.R.J.*, 2014 WL 199209, at *1. The parties lived in Atlanta, Texas. *Id.* When the mother decided to move to New Mexico, the father petitioned the trial court and asked it to impose a geographic restriction. *Id.* The father often missed visitation times because of his work schedule and was able to arrange last-minute visits to make up for the missed time because the parties lived in the same town. *Id.* at *8. In Atlanta, the child lived within twenty miles of his maternal great-grandparents, both sets of grandparents, as well as aunts, uncles, and cousins, and the child had "regular contact" with these extended family members. *Id.* at *2, *5. The child was involved in soccer and baseball, and his grandfather coached his soccer team. *Id.* at *8, n.11. There was evidence that the child played sports, liked his school in Atlanta, and was a good student and that the child had no family or any ties to New Mexico. *Id.* at *5. The mother wanted to move 1,042 miles away because her husband would earn more money and because they would live "in a two bedroom, two bath apartment in a nice neighborhood." *Id.* at *7. The mother proposed that the father visit four times each year during extended breaks from school because it was too far for C.R.J. to travel. *Id.* at *5, *8. She estimated that it would cost approximately $220 to $250 for each roundtrip. *Id.* at *5.

The court of appeals affirmed the trial court's finding that a geographic restriction within 100 miles of Atlanta, Texas, was in the best interest of the child and reasoned that relocation to New Mexico would remove the child from the father's daily life, that visitation would be difficult, that the father could no longer make up missed periods of visitation, and that the child would no longer see his extended family members on a daily or weekly basis. *Id.* at *8. These cases are examples of the type of evidence that is necessary to support a decision that a geographic restriction is in the best interest of the child.

Beathaney contends that the evidence supports the geographic restriction because Ryan wanted to move to San Angelo for purely financial reasons and because the move "would interfere with M.C.M.'s time and schedule with his mother." The fact that relocation would "interfere" with the previously agreed-to visitation schedule is not a factor in determining the best interest of the child in the context of a proposed relocation. Instead, courts are to consider whether the noncustodial parent would be deprived of the "right to have regular and meaningful contact." *Lenz*, 79 S.W.3d at 18.

Furthermore, the custodial parent's improved financial situation and the effect on the noncustodial parent's right to have regular and meaningful contact are only two of several factors courts balance in the fact-driven analysis to determine whether a geographic restriction is in the best interest of the child. *See Lenz*, 79 S.W.3d at 15–16; *see also* FAM. § 156.101(a). In a factual sufficiency challenge, as raised in this case, we must "consider and weigh all of the evidence" to determine if it is so against the great weight and preponderance of the evidence—even if "the record contains some 'evidence of probative force' in support of the verdict." *In re King's Estate*, 244 S.W.2d 660, 661 (Tex. 1951).

As set out above, the first two *Lenz* factors require us to consider the child's relationship with and the presence of extended family and friends. M.C.M.'s

maternal grandmother apparently lives in or near Stephenville, but there is no testimony about where she lived or the nature of her relationship with M.C.M. Ryan testified that his parents were involved in M.C.M.'s daily life and that they were moving to San Angelo to be closer to M.C.M. Ryan lived in San Angelo when he was young, and his two best friends, his grandparents, his cousins, and two sets of aunts and uncles also live in San Angelo. M.C.M. has had a relationship with Ryan's extended family in San Angelo his whole life. M.C.M. had been attending kindergarten in San Angelo for more than a month at the time of the hearing; Emily testified that M.C.M. was doing well, and Ryan said that M.C.M. had "lots of friends." When asked whether she thought it was traumatic for M.C.M. to go to kindergarten in Stephenville for two days and then transfer to an elementary school in San Angelo, Beathaney said that MCM "has friends here and he's already previously gone to school with them," but there was no testimony about M.C.M. playing sports, being involved in church, having neighborhood friends, or having any ties to Stephenville other than Beathaney. While Beathaney argues that the evidence shows that M.C.M "got along well with his stepfather," we find no such evidence in the record.

The third factor requires us to consider the presence of a stable environment, and the parties agree that both parents are stable and supportive. The fourth and fifth factors concern the custodial parent's improved financial and emotional state. Ryan and Beathaney both acknowledge that Ryan's financial situation would improve, and from evidence of Ryan's family and friends living in San Angelo and his ability to better provide for his new wife and second child, it is reasonable to infer that Ryan's emotional state would benefit from the move.

The final three factors relate to the noncustodial parent. These factors require that we consider Beathaney's right to have regular and meaningful contact with M.C.M., her ability to relocate, and her ability to adapt her work schedule.

12

Beathaney argues that the "previously agreed-to possession and access schedule, which worked well for M.C.M. and for the parties, only worked if the parties lived close to one another." Conspicuously absent from the record, however, is any evidence about Beathaney's inability to relocate or her inability to adapt her schedule. Beathaney testified that the previous possession schedule was based on her work schedule, that she is no longer working, and that she may not return to work after her baby is born because "it would just all depend on how much time it would take away from [her] time with [her] children."

Ryan proposed that he and Beathaney follow the standard possession schedule for parents who live more than 100 miles apart with two small changes. Ryan worked during the first and third weekends of each month and did not want to work on weekends when M.C.M. would be in San Angelo, so he instead proposed that Beathaney have possession on the second, fourth, and fifth weekends rather than the standard first, third, and fifth weekends. Ryan additionally proposed that they alternate weeks of possession during the summer instead of M.C.M. spending the first half with one parent and the second half with the other parent. Beathaney does not direct us to any evidence or explain how this arrangement would deprive her of the right to have regular and meaningful contact.

We agree with Beathaney that relocation to San Angelo would indeed "interfere" with her ability to have possession of M.C.M. on school days and that the existing possession arrangement "only worked if the parties lived close to one other." We cannot tell from the record whether Beathany could relocate to San Angelo or the San Angelo area and achieve the desired result. Beathany does not work outside the home. Her husband, M.C.M.'s stepfather, however, is employed. Beathany's ability to relocate to San Angelo would seem to be dependent upon whether her husband had the ability to relocate to San Angelo or the San Angelo area. But Beathaney offered no evidence about her husband's job, the nature of his

13

work, his ability to adapt his schedule, or his ability to relocate so that Beathany could continue the agreed-upon possession schedule or arrange a similar schedule.

Without evidence of M.C.M.'s ties to Stephenville and the extent, if any, of M.C.M.'s relationship with any extended family in Stephenville, and absent evidence about M.C.M.'s relationship with his stepfather and the stepfather's ability to relocate or adapt his work schedule, the trial court did not have sufficient information upon which to determine that a geographic restriction was in the child's best interest. Because the evidence is factually insufficient to support the trial court's finding that a geographic restriction is in M.C.M.'s best interest, we must conclude that it was an abuse of discretion to modify the parent-child relationship to impose a geographic restriction to Erath County and to order that M.C.M. be enrolled in Stephenville ISD. Ryan's first issue on appeal is sustained.

Accordingly, we reverse the order of the trial court, and we remand the cause for a new hearing to determine whether it is in the child's best interest to impose a geographic restriction on Ryan's right to designate M.C.M.'s primary residence.


JIM R. WRIGHT
CHIEF JUSTICE


July 17, 2014

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.

14